OLD DOMINION COPPER MINING AND SMELTING COMPANY
*vs.* ALBERT S. BIGELOW.

SAME *vs.* SAME.

Suffolk.    November 18, 19, 1908. — September 14, 1909.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, BRALEY, SHELDON, & RUGG, JJ.

*Equity Pleading and Practice,* Appeal, Damages, Supplemental answer, Injunction. *Conflict of Laws. Corporation,* Liability of promoter. *Equity Jurisdiction,* To compel promoter of corporation to account for secret profit, Laches, *Res judicata,* Concurrent jurisdiction. *Limitations, Statute of. Res Judicata. Constitutional Law,* Full faith and credit clause. *Joint Tortfeasors. Judgment. Words,* "Promoter."

Upon an appeal from the decree of a single justice for the plaintiff in a suit in equity by a corporation against one of its two promoters, to recover damages for a breach of fiduciary duty by the promoters in selling certain property to the plaintiff at a large profit without a disclosure of material facts, the defendant contended that certain facts essential to the plaintiff's case, which were found by the single justice, were not supported by the evidence. The evidence was oral, documentary and in depositions, and this court, after a careful examination of a voluminous record, held that the findings of fact made by the single justice were warranted by the evidence and should stand.

Upon an appeal from the decree of a single justice for the plaintiff in a suit in equity by a corporation against one of its two promoters, to recover damages for a breach of fiduciary duty by the promoters in selling certain property to the plaintiff, to be paid for in shares of the plaintiff, at a large profit without a disclosure of material facts, it appeared that the plaintiff was organized under the laws of the State of New Jersey and that the vote of the plaintiff's directors to purchase the property from the promoters was passed at a meeting of the board of directors which was held in the city of New York, but it also appeared that it was the intention of the parties that the contract should be carried out and consummated by the delivery of deeds and the issuing of certificates of

stock in Massachusetts, where it was intended that the offices of the company should be, and where afterwards they were established and where also the contract was in fact carried out. The defendant contended that the contract was governed by the law of New York, and introduced evidence of the law of that State consisting of certain decisions of its courts. The single justice ruled that the rights of the parties arising from the transaction were to be determined according to the law of this Commonwealth. He also found as a fact that the law of New York applicable to the case was the same as that of Massachusetts. *Held*, that there was no error, and that upon the record and the findings the law of this Commonwealth controlled the rights and obligations of the parties.

A promoter stands in a fiduciary relation to a corporation which he organizes.

In a suit in equity, by a mining corporation organized under the laws of the State of New Jersey, against one of the two promoters who planned and effected its organization, to recover damages for a breach of fiduciary duty by the promoters in selling certain mining property to the plaintiff at a large profit without a disclosure of material facts, it appeared that, at the time of the vote of the plaintiff's directors by which the contract in question was approved, the corporation had been organized and was authorized to do business under the laws of New Jersey, although the whole of its capital stock had not been issued or subscribed for, and that the defendant and the other promoter together owned all the shares of the corporation which then had been issued, that the intrinsic value of the property sold by the promoters to the plaintiff was not more than $1,000,000 although its market value, owing to the skilful manipulation of the promoters, was something less than $2,000,000, and that for this the promoters received stock of the plaintiff of the par value of $3,250,000 and of the actual value of at least that amount, subject to the payment of legitimate expenses of not over $20,000, that it was a part of the plan of organization and was the intention of the promoters that $500,000 of the capital stock should be issued to subscribers at par to provide a working capital, that at a meeting of the directors of the plaintiff, which was held a few days after the first meeting of the stockholders, the defendant became a director and the president of the plaintiff and the other promoter became a director, and it was voted to increase the capital stock and to purchase the property from the promoters for the price above named, paying for it in the new stock, the amount of new stock authorized exceeding that price by $500,000 of par value. At this meeting the votes were passed by a majority of four of the seven directors, the other three not being present. Two months and one week later, another meeting of the directors was held at which all of the seven directors were present, the five in addition to the two promoters being their tools. At this meeting it was voted to issue to the promoters and their nominee the agreed amount of capital stock for the purchase of the property. It then was voted that the treasurer of the company be instructed to issue shares representing $500,000 of par value " to such parties as have subscribed for the same." On the day of this meeting or on the following day, certificates for the shares were issued to the promoters and their nominee in accordance with the votes, and a certificate for the remaining shares of stock of the par value of $500,000 was made out in the name of the treasurer of the company. At the end of the record of the meeting all the directors signed an assent to the acts done, the promoters and their nominee signing for shares of the par value of $3,250,000 and the plaintiff's treasurer signing for shares of the par value of $500,000, which in fact were the property of the plaintiff. All but about $9,000 of the $500,000 of shares in the name of the treasurer were issued to subscribers at par not long after their issue was authorized, and the remaining $9,000 of shares were sold about two years later

by direction of the plaintiff's treasurer, their face value being credited on the books as treasury stock and the excess above par for which they were sold being credited to interest account. To none of the subscribers to whom the $500,000 of shares were issued were the terms of the contract with the promoters disclosed before they paid for their shares. *Held,* that the defendant was liable to account to the plaintiff for the secret profit of the promoters from the sale of their own property to the plaintiff, that there was no such ratification by the stockholders of the contract with the promoters as to deprive the corporation of its remedy, and that the promoters at the time of the transaction did not represent all the shares of capital stock contemplated as a part of the promotion scheme, because they were not the subscribers for the $500,000 of shares to be issued to provide the working capital. KNOWLTON, C. J., MORTON, & HAMMOND, JJ., dissenting.

There can be no laches so long as there is no knowledge of the wrong complained of and no failure to avail one's self of reasonable opportunities to ascertain the facts.

In a suit in equity founded on a breach of trust where there has been a fiduciary duty on the part of the defendant to disclose the facts on which the cause of action rests, the statute of limitations does not begin to run until the facts have been or ought to have been discovered.

In a suit in equity, by a corporation against one of the two promoters who planned and effected its organization, to recover damages for a breach of fiduciary duty by the promoters in selling certain property to the plaintiff at a large profit without a disclosure of material facts, if the plaintiff proves a case which entitles it to relief, and it appears that the breach of trust on which the liability of the defendant depends was a joint act of the defendant and the other promoter, who is not a party to the suit, for the benefit of both, the division of the profits between the promoters cannot affect the rights of the plaintiff against the defendant, the breach of trust committed by the promoters being in the nature of a tort which makes them liable for the whole damage severally as well as jointly.

In a suit in equity, by a corporation against one of the two promoters who planned and effected its organization, to recover damages for a breach of fiduciary duty by the promoters in selling certain property to the plaintiff at a large profit without a disclosure of material facts, where the plaintiff proves a breach of trust on the part of the promoters which entitles him to relief, and it appears that the situation of the parties and the property is not such as to make it just to order a rescission of the contract of sale, the defendant may be ordered to pay to the plaintiff the amount of the secret profit of the promoters.

In a suit in equity, by a corporation against one of the two promoters who planned and effected its organization, to recover damages for a breach of fiduciary duty by the promoters in selling certain property to the plaintiff in exchange for shares of capital stock of the plaintiff at a large profit without a disclosure of material facts, if the plaintiff proves a case which entitles it to an order for the payment to it of the amount of the secret profit of the promoters, and there is no difficulty in ascertaining the fair market value of the property sold and conveyed by the promoters to the plaintiff or of the shares of the plaintiff's stock received by the promoters in payment, the difference between these two values is the measure of damages, and the test is not the difference between the market value of the shares received by the promoters and the cost to them of the property conveyed by them to the plaintiff.

In a suit in equity, which has been remitted by the full court for a hearing before a single justice upon the question whether the defendant should be allowed to file a supplemental answer setting up as a bar the decree of a court in another jurisdiction rendered, while the suit in this Commonwealth was pending, in a suit by the same plaintiff relating to the same subject matter and in which the issues were identical, the defendant in the suit in this Commonwealth having contributed toward the defense of the suit in which the judgment was rendered and alleging that he was a party or privy thereto, an order of a single justice allowing the defendant to file such a supplemental answer is a matter within the discretion of the single justice, and unless such discretion was exercised wrongly the order must stand. It here was held that in making such an order the single justice could not be said to have erred in permitting the defendant to set up a decree, resting upon the decision of a court of last resort, which was made after the close of the hearing upon the merits in the suit in this Commonwealth.

A decree founded upon a demurrer may be a bar to another suit.

Under art. 4, §1, of the Constitution of the United States, requiring that full faith and credit shall be given in each State to the public acts, records, and judicial proceedings of every other State, the question whether a defendant in a suit in equity in this Commonwealth, who sets up as a bar to the suit the decree of a United States court in another State, rendered in a suit brought by the same plaintiff in which the same issues were involved, was privy to that suit, is a jurisdictional question to be determined by the law of this Commonwealth, subject to the Constitution of the United States.

Mere participation in the defense to a suit by one not a party to it, because of general or personal interest in the result of the litigation, does not make such participator privy to the suit with a right to set up the judgment or decree therein as a bar to another suit brought against him by the same plaintiff and involving the same issues.

By the settled law of this Commonwealth one of two or more joint tortfeasors, in an action at law or a suit in equity brought against him as severally liable for the joint tort, cannot set up as a bar a judgment or decree in favor of another of the joint tortfeasors in an action or suit brought by the same plaintiff for injury from the same joint tort.

In a suit in equity, brought by a corporation organized under the laws of another State against a citizen of this Commonwealth, after the case had been heard upon the merits and a single justice of this court had made a decree in favor of the plaintiff, from which the defendant had appealed, and while the case was upon the docket of the full court and was about to be reached for argument, the defendant procured in a court of equity, not of the last resort, in the State in which the plaintiff was organized a temporary injunction against the prosecution of the suit in this Commonwealth. Later, the defendant's suit in the other State, in which he obtained such temporary injunction, was decided adversely to him, and he asserted that he intended to prosecute an appeal to the highest court in that State. Thereupon, on a motion by the plaintiff in the suit in this Commonwealth, an interlocutory decree was made by a single justice of this court, restraining the defendant from further prosecuting the suit in the other State "and from commencing or prosecuting any other suit or proceeding either in law or in equity, except in this court, against the plaintiff to prevent it from obtaining the final decision and decree of this court, or in any manner to delay or impede the presentation of said case." The defendant appealed from this interlocutory decree and from refusals of the single justice to vacate or modify it.

*Held*, that it was manifestly proper that at this stage of the proceedings the defendant should be restrained from attempting to interfere through courts of other jurisdiction with the conclusion of the litigation in this Commonwealth.

TWO BILLS IN EQUITY, filed on October 7, 1902, by the Old Dominion Copper Mining and Smelting Company, a corporation organized under the laws of the State of New Jersey, against Albert S. Bigelow of Cohasset, one of the two promoters who planned and effected the organization of the plaintiff, to compel, after rescission by the plaintiff, the restitution of the consideration received by the promoters for certain property alleged to have been sold by them to the plaintiff at a large profit without a disclosure of material facts, or to compel the defendant to account to the plaintiff for such secret profit, and to pay damages for such breach of trust, as described in 188 Mass. 315–320, the first suit relating to the original issue of thirty thousand shares and the second suit to the original issue of one hundred thousand shares of the capital stock of the plaintiff.

The defendant demurred to the bills, and upon a reservation for determination by this court the demurrers were overruled in a decision reported in 188 Mass. 315.

The cases were heard on the merits by *Sheldon,* J., who on December 10, 1907, made a decree that the plaintiff should recover from the defendant a sum of money found by the justice to be due to it from him, with interest from a day named, and that execution should issue against the defendant for the total sum with costs.  Both the plaintiff and the defendant appealed.

While the cases were on the docket of the full court and were about to be reached for hearing at the March sitting of 1908, the defendant filed a bill in equity in the Court of Chancery of the State of New Jersey, praying for an injunction against the prosecution of the pending suits in this Commonwealth, and upon this bill a temporary injunction was issued by the New Jersey court as described in the opinion.   On August 8, 1908, the New Jersey court made a decree dismissing the suit in that State, and the present defendant, as the plaintiff in that suit, announced his intention to prosecute an appeal from the decree.   Thereupon, on motion of the plaintiff in the present suits, *Braley,* J., on August 14, 1908, made in each of the cases the following in-

terlocutory decree : " It is ordered and decreed that an injunction issue restraining the defendant Albert S. Bigelow, his attorneys, agents, and servants from further prosecuting the action commenced by said Bigelow against the plaintiff in the Court of Chancery in the State of New Jersey, as is in the plaintiff's petition set forth ; and from commencing or prosecuting any other suit or proceeding either in law or in equity, except in this court, against the plaintiff to prevent it from obtaining the final decision and decree of this court, or in any manner to delay or impede the presentation of said case according to the due and orderly course of procedure in this court, or until further order of the court."

On August 26, 1908, the defendant made a motion to vacate the interlocutory decrees of August 14, 1908, and to dissolve the injunction issued thereon.  On August 28, 1908, the defendant made another motion to modify the decrees of August 14, 1908, and the injunctions issued thereon.  On August 28, 1908, *Braley*, J., made orders denying both of these motions.  In each of the cases the defendant appealed from the decree of August 14, 1908, and from the orders denying the defendant's motions to vacate or modify such decree.

While the appeals from the decrees made by *Sheldon*, J., were still on the docket of the full court, the defendant made a motion to be allowed to file a supplemental answer setting up as a bar to the plaintiff's claims a judgment of the Circuit Court of the United States for the Southern District of New York entered on July 23, 1908, in a suit in equity entitled *Old Dominion Copper Mining & Smelting Co.* v. *Frederick Lewisohn & others, executors*.  The motion was heard at a special sitting of the full court, and on September 4, 1908, this court made an order vacating the decrees and remitting the cases for hearing before a single justice upon the question whether the defendant should be allowed to file the supplemental answer, and, if his motion was allowed, for a further hearing upon the matters set up in this answer, " and for reversal or such modification of the original decree, if any, as ought to be made by reason of these matters," as reported in 199 Mass. 488.

The cases were heard by *Braley*, J., upon a motion of the defendant to be allowed in each of the cases to file a supple-

mental answer setting up the above named judgment as a bar, and to introduce evidence to prove the facts alleged therein. On September 16, 1908, the justice made an order granting the motion. The plaintiff, instead of taking an appeal, asked the justice to report his action to the full court. In accordance with this request he did so. If his action was reviewable, then, if the allowance of the amendment was wrong, the order was to be reversed ; otherwise it was to stand.

A commissioner was appointed to take the evidence relating to the matters set forth in the supplemental answer, and the cases came on to be heard before *Hammond,* J. On October 9, 1908, he made an order reserving the cases for determination by this court, using in each case the same language, which was as follows :

" This case came on to be heard upon the evidence relating to the matters set forth in the supplemental answer filed by the defendant September 4, 1908, and evidence introduced on behalf of the defendant and on behalf of the plaintiff, as more fully appears in the commissioner's report thereof ; and after the hearing of said evidence a decree in the form of the original decree in said case was ordered, but the question of whether or not said order should be modified or reversed by reason of said supplemental answer, and the evidence in support thereof, is reserved for the consideration of the full court ; and this case, including the entire record and the commissioner's reports of the evidence, is now reserved for the consideration of the full court as if upon the original appeals from the final decree of December 10, 1907, and for such further modification, if any, as should be made therein by reason of the evidence bearing upon said supplemental answer, and also upon the reservation concerning the order permitting the filing of said supplemental answer, and also upon the appeal of the defendant from the decree entered August 14, 1908, granting an injunction, and also upon the appeals of the defendant from the orders entered August 28, 1908, refusing to modify or vacate said decree of August 14, 1908, and for such final decree and order upon this reservation as justice and equity require. The foregoing is made as a reservation and not as a decree."

The case was argued at the bar in November, 1908, before

*Knowlton*, C. J., *Morton, Hammond, Braley*, & *Rugg*, JJ., and afterwards was submitted on briefs to all the justices.

*A. Hemenway & J. W. Farley*, for the defendant.

*L. D. Brandeis & E. F. McClennen*, for the plaintiff.

RUGG, J.    These are suits in equity, by which the plaintiff seeks to recover secret profits made by the defendant as one of its organizers, in selling to it while under the absolute control and management of himself and his associate, one Lewisohn, certain mining properties belonging to him and Lewisohn.   The allegations of the bills are set out at length in 188 Mass. 315, where one of the cases was considered upon demurrer.   After the overruling of the demurrer the defendant answered, and the cases were heard before a single justice, who entered decrees in favor of the plaintiff in both cases and filed a report of the facts found by him.   Except as to matters immaterial so far as the questions of law are involved, he found that the allegations were sustained. Briefly recapitulated, the facts appearing in the report upon which the plaintiff rests its claim are that in April, 1895, the defendant and Lewisohn formed a device to secure the control of the stock (the par value of which was $500,000) of the Old Dominion Copper Company of Baltimore City, called the Baltimore Company, and the title to certain other neighboring mining properties, called the outside properties, and to cause these properties and the real estate of the Baltimore Company to be transferred to a new corporation (which they should procure to be organized with a much larger capital), for an increased price. Options were secured upon these properties, and the price agreed to be paid by the defendant and Lewisohn to the owners was $1,000,000, divided in the proportion of 547/1000 by the defendant, and 453/1000 by Lewisohn.   The outside properties were regarded by all parties as of little or no value and were thrown in as a makeweight in the purchase of the stock of the Baltimore Company.   The single justice, while finding that they could not be said to be of no value, was satisfied that their value did not exceed $50,000.   No examination to ascertain their value was made by the defendant or Lewisohn, or by any one in behalf of the plaintiff.   For the purpose of providing himself with funds to meet in part his financial obligations for the purchase of the properties, the defendant, before

taking up the options, organized an underwriting syndicate and another syndicate called the Old Dominion Syndicate.   It is not necessary to state the details of these arrangements, further than to say that it is found as a fact that the defendant did not deal fairly with the members of the syndicate in the division of his profits, and did not disclose to the great majority of them the fact of the secret profit.   The obligation of purchase was assumed wholly by the defendant and Lewisohn, and the device for the organization of the new corporation was entirely theirs. Although, as first conceived, it was the avowed intention of the defendant and Lewisohn (which the defendant expressed to various members of the syndicate) to form a new corporation with a capital stock of $2,500,000 which should take the property of the Baltimore Company and the outside properties for $2,000,000 of its capital stock and procure a working capital of $500,000 by the sale of the rest of the capital stock to the public for cash at par, they proceeded to organize the plaintiff corporation under the laws of New Jersey, with a capital stock of $3,750,000, divided into one hundred and fifty thousand shares of the par value of $25 each.   But it was the intention of the defendant and Lewisohn (as found by the single justice) that "twenty thousand shares of the capital stock of the plaintiff should be issued to new subscribers at par; and this was done in the summer and fall of 1895."   This organization was conducted and controlled wholly by the defendant and Lewisohn through themselves and their agents and representatives.   Without providing the plaintiff with an independent board of officers or representatives they, as the responsible and only managers of the plaintiff, acting in its name, contracted with themselves as mine owners to sell to it the real estate of the Baltimore Company for $2,500,000 of the capital stock of the plaintiff and the outside properties, of trifling value at best, for $750,000 of such capital stock, and to sell to the general public for working capital the remaining $500,000 of capital stock of the plaintiff at par, without disclosing that they had sold property costing them only $1,000,000 for three and a quarter times its cost.

The first meeting of the stockholders was held on July 7, 1895, at which $1,000, — the lowest amount of capital with which a corporation organized under the laws of New Jersey

could begin business, — was paid in by Lewisohn. This money, although deposited to the credit of the plaintiff company upon its organization, was afterwards returned by it to Lewisohn in an accounting with him. A meeting of the directors was held in New York on July 11, 1895, at which the defendant became a director and the president of the plaintiff and Lewisohn a director. Votes were passed .to increase the capital stock and two separate votes for the purchase of the mining properties for the prices in stock before indicated. The stock, the market value of which was fully as great as its par value, was issued to the defendant and Lewisohn and one Dumaresq, their nominee, by votes of September 18, 1895, on that or the following day. At the same time a certificate for the remaining twenty thousand shares of stock of the par value of $500,000 was made out in the name of " Thomas Nelson, treasurer," but this stock is found to have belonged to the corporation, and Nelson had no right to act respecting it, as it was taken up by direct subscriptions of the public. The conveyances of the mines by the Baltimore Company and of the outside properties by Lewisohn were not made until December, 1895, or January, 1896. The intrinsic value of the property conveyed by the Baltimore Company is found to have been not more than $1,000,000, although its market value, largely due to the skilful manipulation of the defendant and Lewisohn, and " the ingenious manner in which they created a desire on the part of men interested in mines, as investors or speculators, to be allowed to join in the transaction. they were carrying out," was something less than $2,000,000. The report proceeds : " But, taking the most favorable view of the situation possible for the defendant, he and Lewisohn did, by reason of their failure to disclose the real facts as aforesaid, make out of their sale to the plaintiff company a secret profit of fifty thousand shares of its capital stock, of which the defendant's portion was twenty-seven thousand three hundred and fifty shares, and Lewisohn's portion was twenty-two thousand six hundred and fifty shares. If he had fully disclosed the facts to the plaintiff company and secured for it independent advice, it would not have given to him this secret profit.; . . . Lewisohn and he were acting in the formation and execution of the scheme together and in concert. Each of them was doing his

part to carry out a joint scheme, which was intended to inure to the advantage of both. The control exercised by them over the plaintiff company was a joint control, and was exercised by them for the benefit of both. A proper disclosure of the real facts by either would have frustrated the schemes of both; they both acted together in pursuance of a common design, and for the profit of both." " During all these transactions the full control of the plaintiff company was in the hands of and was exercised by the defendant and Lewisohn, who were its promoters and who themselves determined upon and dictated, under the advice of their counsel, everything that was done by the plaintiff company or in its behalf; it had no directors, representatives, or advisers other than themselves or their agents; and they did not disclose to it any of the facts which have been stated. This continued to be the case until April, 1902. . . .

" The result of his and Lewisohn's transactions with the plaintiff company was that for the $1,000,000 of their own and their associates' money which they invested, they received, subject to the payment of legitimate expenses of not over $20,000, stock to the par value of $3,250,000, and of the actual value of at least that amount: that is, at the rate of more than three dollars for one. He gave to the members of his syndicate two dollars for one, either wholly in stock or half in cash and half in stock, as they elected. With a few individual exceptions he did not disclose the facts to them. The very great majority of the members of his syndicate did not become aware of the details of what he and Lewisohn had done." The capital stock issued to defendant and Lewisohn was stamped " Issued for property purchased." The law of New Jersey required that such stock be issued only " to the amount of the value " of the property so purchased. Pub. Laws of New Jersey, 1889, p. 414, § 4; 1893, p. 444, § 2. The vote of July 11, 1895, to purchase the mining properties was in fact passed by a majority only of the board of directors, for three do not appear to have been present at that time. At the directors' meeting of September 18, 1895, when the votes to issue thirty thousand full paid shares to the defendant and Lewisohn and one hundred thousand like shares to their nominee Dumaresq were passed, seven directors were present, the five aside from Bigelow and Lewisohn being their

tools, and at the end of the record of that meeting all the directors signed an assent to the acts done, and Bigelow and Lewisohn, signing for thirty thousand shares of capital stock, Dumaresq signing for one hundred thousand shares of the capital stock, and "Thomas Nelson, Treasurer," signing for twenty thousand shares of capital stock, being the whole number of shares, signified a written approval of the acts of that meeting. The single justice found that the twenty thousand shares were the property of the plaintiff, and that Nelson had no right to attempt to act as their holder.

1. The defendant strenuously contends that certain facts found by the single justice are not supported by the evidence. He first attacks the finding, vital to the plaintiff's case, that the scheme of the defendant and Lewisohn, as framed and executed, contemplated that twenty thousand shares of stock in the plaintiff corporation should be issued to new subscribers at par, and that the defendant and Lewisohn did not agree to take all the stock in the plaintiff corporation in return for the mining properties conveyed to it and $500,000 in cash for a working capital. He argues that the evidence required a finding that Bigelow and Lewisohn agreed as a part of their scheme to take all the capital stock in return for the mines and $500,000 in cash. He also assails the findings, that the property conveyed to the plaintiff by the defendant and Lewisohn for one hundred and thirty thousand of its shares of a par value of $3,250,000 was worth intrinsically not more than $1,000,000, and that its market value, due to the skilful manipulation of the defendant and Lewisohn and their ingenious baiting of the stock market, was less than $2,000,000; and he contends that the evidence demonstrates the truth to be that the plaintiff paid no more than it was worth.

The evidence was oral, documentary and in depositions. The rule of practice respecting such a contention as this has been often declared. In an appeal in equity from a final decree, where all the testimony is reported, it is the duty of the appellate court to examine the evidence and decide the case on its merits, both as to the facts and the law; but where the evidence upon disputed issues is partly oral, the findings of fact of a single justice will not be disturbed unless plainly wrong. *Jennings* v. *Vahey*, 183 Mass. 47. *Lindsey* v. *Bird*, 193 Mass.

200. It becomes necessary, therefore, to examine the evidence upon this point somewhat in detail.

The offers of the Baltimore Company for the sale of its property to the plaintiff, and of Lewisohn for the sale of the outside properties, were in writing, and the votes of the plaintiff accepting them were spread upon the records of the directors' meeting of July 11, 1895. These provided distinctly for the issue of one hundred and thirty thousand shares of the plaintiff's capital stock in payment for these conveyances. The records of the plaintiff show no vote touching the issue of the remaining twenty thousand shares. If, as claimed by the defendant, it was then contemplated that these shares should be issued to him and Lewisohn at par for cash, it seems probable that a vote to this effect would then have been passed. The only vote respecting the issue of these remaining shares was that of the directors on September 18, 1895, when, after a vote authorizing the issue of a certificate for one hundred thousand shares to Dumaresq (who was the nominee of Bigelow and Lewisohn) and another for thirty thousand shares to Bigelow and Lewisohn, it was voted that the treasurer of the company be "instructed to issue twenty thousand shares . . . to such parties as have subscribed for the same." If it was then understood that Bigelow and Lewisohn had agreed to take all the shares, including the twenty thousand for cash at par and were the subscribers therefor, no sufficient reason appears for not saying so in the vote, instead of adopting a phrase suited to express an intent to issue the shares to the general public. Moreover, at this time, as shown by the only subscription list of the plaintiff, the general public had subscribed generously for stock. The language of the vote aptly refers to such subscribers. The only paper, which appears by the evidence to have been signed by subscribers for stock, was dated July 18, 1895, two months before the vote to issue the twenty thousand shares was passed. The certificate for the twenty thousand shares was issued in the name of "Thomas Nelson, Treasurer," he being the treasurer of the plaintiff. It is ingeniously argued that in this matter Nelson was acting as the treasurer of those who had become subscribers to stock and not as treasurer of the plaintiff. But he treated their payments as if made to the treasurer of the

plaintiff. If this certificate had been in truth issued to the nominee of Bigelow and Lewisohn in return for their obligation to pay cash for its face value, naturally it would have been issued without any official title attached, as was that to their nominee, Dumaresq. It is a significant coincidence that the form of certificate selected was the same which, in other companies controlled by the defendant, was used when stock was in fact treasury stock. This certificate was subdivided in the autumn of 1895, and nineteen thousand six hundred and fifty shares were issued to various subscribers, who paid for them directly to the plaintiff, and not to Bigelow or Lewisohn. The remaining three hundred and fifty shares, although subscribed for, were not taken by subscribers. They were not taken or paid for by Bigelow or Lewisohn, but about two years later were sold by direction of Nelson, who was still the treasurer of the plaintiff, through brokers, and their face value credited on the plaintiff's books to treasury stock and the excess above par, for which they were sold, to the interest account. This sum does not appear to have been the equivalent of interest due from the defendant and which should have been paid, if he originally subscribed for the shares, and his name does not appear in connection with them on the plaintiff's books. The transaction respecting the subdivision of this certificate was conducted in substance on the footing of original subscribers, and not of purchasers from Bigelow. The names of those, to whom the shares were issued, appear upon the "Corrected List" of the plaintiff, which was its only record of subscription, and in which the shares taken by each are described as "allotments." If they were subscribers to the defendant and Lewisohn merely for stock held by them, there was no reason why their names should appear on the plaintiff's subscription list. Notices were sent to these subscribers by the treasurer of the plaintiff, and not by Bigelow, and checks were returned payable to the order of the treasurer, and were deposited directly to the credit of the plaintiff, although notices and subscriptions to the syndicate formed by Bigelow to aid him in furnishing the purchase price were sent by and returned to Bigelow. Various written statements of Bigelow, as for instance that they proposed "to open the bag just a little to the public" and that the public were "starving" for the shares, appear inconsistent with the

theory that he and Lewisohn were the subscribers for the entire capital stock.   These and other circumstances are sufficient to warrant the finding of the single justice.   Apparently he credited contemporaneous acts, entries and other writings with their natural inferences rather than the direct oral and other testimony to the contrary given at the trial.   It cannot be said that in this he was plainly wrong.

The finding as to the value of the property conveyed by the defendant and Lewisohn to the plaintiff is also supported by testimony and cannot be disturbed.   The evidence touching this matter came from various sources.   The former owners had operated the mine with some degree of success on a capitalization of $500,000.   They had greater experience and a more intimate knowledge respecting it than any one else, and they seem to have been men accustomed to large business operations and not unfamiliar with mining.   They do not appear to have been under any compulsion to sell.   The price for which such owners in fact sold their property might well have been regarded as the best test of its value.   But the finding was approximately double this sum.   Although other circumstances perhaps might have supported a higher valuation, there is no ground for holding this plainly, or even probably, wrong.

These are the main facts relied upon by the plaintiff.   Other findings are controverted by the defendant.   Without discussing them in detail it is enough to say that a careful examination of the voluminous record discloses no reason for doubting their correctness.

2. At the threshold lies the question as to what law determines the character of these transactions and the liability of the defendant therefor.   The votes to purchase the real estate of the Baltimore Company and the outside properties were passed at a meeting of the plaintiff's board of directors held in New York, but they were not New York contracts in the sense that they are to be governed necessarily by the law of New York. As found by the single justice, " It was the intention of the parties that these agreements should be carried out and consummated by the delivery of the deeds and the issue of certificates of stock in Massachusetts, where it was intended that the offices of the company should be, and where they were estab-

lished, in Boston, and where, in fact, they were so carried out. It was intended that the business of the company, outside the actual mining and smelting operations, which were to be conducted in Arizona, should be carried on in Massachusetts; and this was done." Where a contract is made with a purpose by the parties to it that it shall be performed in a particular place, its validity and interpretation are to be determined by the law of the place where it is to be performed. It is made with a view to that law. *Pritchard* v. *Norton*, 106 U. S. 124. *Hall* v. *Cordell*, 142 U. S. 116. *Andrews* v. *Pond*, 13 Pet. 65. *Hamlyn* v. *Talisker Distillery*, [1894] A. C. 202. *American Malting Co.* v. *Souther Brewing Co.* 194 Mass. 89. The ruling of the single justice that the transaction is to be determined according to the law of this Commonwealth appears to have been right.

But, however that may be, the single justice has found as a fact that the law of New York applicable to the case is the same as that of Massachusetts. The only evidence as to the New York law before the single justice was the following cases decided by the courts of that State: *Blum* v. *Whitney*, 185 N. Y. 232; *Seymour* v. *Spring Forest Cemetery Association*, 144 N. Y. 333; *Barr* v. *New York, Lake Erie & Western Railroad*, 125 N. Y. 263; *Brewster* v. *Hatch*, 122 N. Y. 349; *Getty* v. *Devlin*, 54 N. Y. 403; *Campbell* v. *Cypress Hills Cemetery*, 41 N. Y. 34; *Colton Improvement Co.* v. *Richter*, 55 N. Y. Supp. 486; and there were also admitted *de bene Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn*, 148 Fed. Rep. 1020; *S. C.* 136 Fed. Rep. 915; and *McCracken* v. *Robison*, 57 Fed. Rep. 375, decided in the United States Circuit Court for the district of New York.

The defendant's attack upon this finding stands upon a somewhat different basis from that upon the other findings of fact, because this rests wholly upon documentary evidence, and the appellate court stands precisely as did the justice, who heard the case, in respect of opportunities to weigh evidence and draw inferences from it. The trial court has not here the advantage of seeing the witnesses and judging of their credibility by personal observation. Hence no special presumption exists in favor of his finding. *Harvey-Watts Co.* v. *Worcester Umbrella Co.* 193 Mass. 138. But the decision must be made upon the evidence

which was before the single justice. The cases in the federal courts are not evidence as to the law of New York, for the reason that, this being a question of general law, the federal courts declare the law upon their own views and are not bound by decisions of State courts. *Olcott* v. *Supervisors*, 16 Wall. 678, 689. *Burgess* v. *Seligman*, 107 U. S. 20, 33, 34. *Pleasant Township* v. *Ætna Ins. Co.* 138 U. S. 67, 73. Moreover, the federal cases cited do not purport to declare what is the law of New York. While none of the decisions of the New York courts is based upon facts precisely like those in the case at bar, *Brewster* v. *Hatch*, 122 N. Y. 349, and *Campbell* v. *Cypress Hills Cemetery*, 41 N. Y. 34, are so nearly akin in essential features, and the statement of legal principles in each is such as to lead to the conclusion that the finding of the single justice was correct.

*Blum* v. *Whitney*, 185 N. Y. 232, is relied upon by the defendant as announcing a different doctrine; but it does not so appear to us. Several corporations and their officers there joined in a written contract for the formation of a new corporation with a fixed capitalization and for the transfer of their several properties to it for a definite amount of its stock. The maximum amount that might be paid for the capital stock of a certain other corporation was fixed by implication in the agreement. All the persons contemplated, and none others, became members of the new corporation. These were treated by the court as together constituting the organizers of the corporation. The fact that the maximum price permitted by the agreement was in fact paid for the capital stock of the other corporation and that a great profit was obtained by some of the organizers was regarded not as a fraud upon the corporation but upon the associates in the organization. It was held not to be a case for the application of the law governing promoters. This case cannot be considered as stating a rule in conflict with the finding of the single justice.

In its practical results it is not of much consequence whether the law of the situs, either of Massachusetts or New York, or of the forum, governs, for upon this record and the findings before us, the law of this Commonwealth controls the rights and obligations of the parties.

3. The next inquiry is as to the liability of the defendant.

The plaintiff seeks to establish this on the ground that the defendant and Lewisohn framed a scheme, which was an entirety and which as a whole comprised the organization and continued management of the plaintiff by themselves, their agents and representatives, until the completion of the project; this scheme was the capitalization of the plaintiff for $3,750,000; the sale to it of their property, costing and intrinsically worth $1,000,000, but having in the market a value not over $2,000,000, for $3,250,000; the sale to the general public at par for cash of the remaining $500,000 of stock; and all this without providing the plaintiff with any independent board of officers or advisers to pass upon the wisdom of the purchase and without disclosing the substance of the transaction and their extraordinary profit to the purchasers of its stock for cash at par. This scheme was an entity, one part of it was just as essential as any other part, and one part was the procurement of $500,000 in cash from the unenlightened public as a working capital for the new company.

It has been decided, apparently by a unanimous court, that such a transaction creates a liability on the part of the defendant to account for his profits to the plaintiff in this proceeding. *Hayward* v. *Leeson*, 176 Mass. 310. One of the present suits was before the court as reported in 188 Mass. 315, and after an elaborate review of the authorities and examination of the grounds for judgment, it was held that the defendant was liable, notwithstanding the opposing decision on the precise point by the United States Circuit Court in *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn*, 136 Fed. Rep. 915. Since the decision reported in 188 Mass. 315, the above entitled case against Lewisohn has been considered by the United States Circuit Court of Appeals (148 Fed. Rep. 1020) and by the Supreme Court of the United States (210 U. S. 206) and without dissent a conclusion has been reached contrary to that of this court. The deference due to a decision by the highest court in the land and the intrinsic importance of the question at issue require a reconsideration of our own cases, a re-examination of the authorities and a careful consideration of the principles involved.

The plaintiff seeks to recover a secret profit made by the pro-

moters in the sale of their own property to the corporation, basing its claim on the general and well recognized proposition that a promoter cannot take lawfully a secret profit and will be held to account for it if he does.* Fundamentally the action is to recover profits obtained by a breach of trust. There is a distinct finding by the single justice that the defendant and Lewisohn were the promoters of the plaintiff. This finding is amply justified by the evidence. In their brains it was conceived, by their direction the formalities of its incorporation were carried out, their resources provided its mines, their influence and reputation with those desiring to invest in mines procured its working cash capital. The word "promoter" has no precise and inflexible meaning in this country. In England it is defined by statute. St. 7 & 8 Vict. c. 110, § 3. See also St. 30 & 31 Vict. c. 131, § 38. But even there the duties of promoters as fiduciaries to the company are matters of common law cognizance. *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218, 1269. In a comprehensive sense "promoter" includes those who undertake to form a corporation and to procure for it the rights, instrumentalities and capital by which it is to carry out the purposes set forth in its charter, and to establish it as fully able to do its business. Their work may begin long before the organization of the corporation, in seeking the opening for a venture and projecting a plan for its development, and may continue after the incorporation by attracting the investment of capital in its securities and providing it with the commercial breath of life. It is now established without exception that a promoter stands in a fiduciary relation to the corporation in which he is interested, and that he is charged with all the duties of good faith which attach to other trusts. In this respect he is

---

* *Parker* v. *Nickerson*, 112 Mass. 195, 196. *Parker* v. *Nickerson*, 137 Mass. 487, 497. *Bagnall* v. *Carlton*, 6 Ch. D. 371. *Emma Silver Mining Co.* v. *Grant*, 11 Ch. D. 918, 936. *Nant-y-Glo & Blaina Ironworks Co.* v. *Grave*, 12 Ch. D. 738. *Lyndney & Wigpool Iron Co.* v. *Bird*, 33 Ch. D. 85. *Whaley Bridge Calico Printing Co.* v. *Green*, 5 Q. B. D. 109. *Chandler* v. *Bacon*, 30 Fed. Rep. 538. *Yale Gas Stove Co.* v. *Wilcox*, 64 Conn. 101, 119, 120. *Hinkley* v. *Sac Oil & Pipe Line Co.* 132 Iowa, 396, 402, 403. *Fred Macey Co.* v. *Macey*, 143 Mich. 138, 152. *Zinc Carbonate Co.* v. *First National Bank of Shullsburg*, 103 Wis. 125. *Pietsch* v. *Milbrath*, 123 Wis. 647. *Cox* v. *Coal & Oil Investment Co.* 61 W. Va. 291, 305.

held to the high standards which bind directors and other persons occupying fiduciary relations.[*]

That the promoter stands in the relation of a fiduciary to the corporation which he organizes seems to be conceded in *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn*, 210 U. S. 206. The questions to be answered are, whether this rule is applicable, and if it is, whether the plaintiff is in a position to assert its claim.

Notwithstanding this fiduciary relation the promoter may sell property to the company which he is promoting. But in order that the contract may be absolutely binding he must pursue one of four courses: (a) He may provide an independent board of officers in no respect directly or indirectly under his control, and make full disclosure to the corporation through them; (b) He may make a full disclosure of all material facts to each original subscriber of shares in the corporation; (c) He may procure a ratification of the contract after disclosing its circumstances by vote of the stockholders of the completely established corporation; (d). He may be himself the real subscriber of all the shares of the capital stock contemplated as a part of the promotion scheme. The defendant does not contend upon this report that either of the first two courses was followed. He does rest his claim chiefly upon the third and fourth courses. As applied to the facts of this case these two come to the same thing, for the reason that on the findings of the single justice the defendant and his associate were subscribers for only one hundred and thirty thousand shares out of a total one hundred and fifty thousand and in the light most favorable to them they held all the shares which had been issued at the time of the ratification, but not all which it was proposed to issue as a part of the scheme of promotion. The point to be determined, therefore, is whether the promoter is immune from liability if he and his associates are

---

[*] *Dickerman* v. *Northern Trust Co.* 176 U. S. 181, 202.   *Yeiser* v. *United States Board & Paper Co.* 107 Fed. Rep. 340.   *Chaffe* v. *Berkley*, 141 Iowa, 344.   *Getty* v. *Devlin*, 54 N. Y. 403; *S. C.* 70 N. Y. 504.   *Loudenslager* v. *Woodbury Heights Land Co.* 13 Dick. 556, 560.   *Exter* v. *Sawyer*, 146 Mo. 302, 322.   *Johnson* v. *Sheridan Lumber Co.* 51 Ore. 35.   *Camden Land Co.* v. *Lewis*, 101 Maine, 78.   *Cox* v. *Coal & Oil Investment Co.* 61 W. Va. 291, 305.   *The Telegraph* v. *Loetscher*, 127 Iowa, 383.   *Hayward* v. *Leeson*, 176 Mass. 310, and cases cited at p. 318.

owners of all the issued stock at the time of the act complained of, although intending as a part of their plan the immediate issue of further stock to the public without disclosure, and whether, while a substantial portion of the stock intended to be issued to the public remains unissued, a vote of ratification of the breach of trust will protect him.

A review of the authorities seems to demonstrate that there is a liability of the promoter to the corporation when further original subscribers to capital stock contemplated as an essential part of the scheme of promoters came in after the transaction complained of, even though that transaction is known to all the then stockholders, that is to say, to the promoters and their representatives.

*Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218, is one of the most important and thoroughly considered cases, and, as it has been said to be a case often misunderstood (Lord Davey in *Salomon* v. *Salomon*, [1897] A. C. 22, 57), it is well to consider it at length. It was first heard by Vice-Chancellor Malins under the name of *New Sombrero Phosphate Co.* v. *Erlanger* (5 Ch. D. 73), then by the justices of appeal (5 Ch. D. 102), and finally by the House of Lords, where it was twice argued. The facts were these : Erlanger and his associates, hereafter spoken of as the syndicate, bought of the official liquidator of a broken down company the lease of a phosphate island, for £55,000. The agreement for purchase was signed on September 11, and was subject to the approval of the judge, which was given on September 15, 1871. By its terms the contract was to be completed on November 15, 1871. The syndicate then organized the New Sombrero Phosphate Company under St. 25 & 26 Vict. c. 89 (3 App. Cas. 1264). The articles of association of the new corporation were signed on September 20, 1871, and the company registered on September 20 or 21 (5 Ch. D. 76). On registration the corporation was created under 25 & 26 Vict. c. 89, § 18 of which provided that upon registration " the subscribers . . . shall thereupon be a body corporate . . . capable forthwith of exercising all the functions of an incorporated company." The signers of the articles of association were tools of the syndicate. The members of the first board of directors were named in the articles of association. Two were out of the country and

would not attend meetings; others were an employee of Erlanger, a retired admiral of the English navy, whose shares necessary to qualify him as a director were paid for by Erlanger (5 Ch. D. 107, 108), and the mayor of London ; three directors made a quorum, and the last three named attended the meetings. The syndicate anticipated its payments required by its contract and acquired the lease of the island on September 21, 1871. The first meeting of the directors was held on September 29, 1871, at which was produced and approved by resolution an agreement between one Evans (in whose name in behalf of the syndicate the contract for the purchase of the lease from the official liquidator was made), and one Pavy (acting for the new company), dated September 20, whereby Evans sold and Pavy for the company bought the lease of the island for £80,000 in cash and £30,000 in paid up stock. In the discussion of this case in 210 U. S. at p. 216 this contract is stated to have been "provisional on the shares being taken and the company formed," but we do not so understand it as set forth in 5 Ch. D. 75, 76 and 95. It was subject to the new company being registered (which was done on September 20 or 21), and to the contract with the official liquidator being approved by the judge (which was done on September 15) and duly performed (which was done on September 21) and to the confirmation by the company (which was given by vote of the directors on September 29, who were in this regard clothed by the articles of association with all the authority of the corporation itself, 3 App. Cas. 1273, 1274), but it contained no other provisional features. The directors adopted the contract between Evans and Pavy without investigation into its merits, and in ignorance of the profit made by the syndicate except as Evans had such knowledge. After this the public oversubscribed. The stock was issued, £30,000 to the syndicate and £100,000 to the public; and on November 2 £80,000 was paid to the syndicate by the company. 5 Ch. D. 96. Respecting this agreement for sale by the syndicate it is further said in 210 U. S. at p. 217, that "the contract seems to have reached forward to the moment when they [the public] subscribed. As it is put in 2 [1 is meant] Morawetz, Corp. (2d ed.) § 292, there was really no company till the shares were issued," and on this ground it is stated by the court at p. 216 that the English case

"seems to us far from establishing a different doctrine for that jurisdiction." We cannot accede to this interpretation. The company was fully formed the moment it was registered. The subscription for the shares required as a prerequisite to registration under the English statute established the company as fully as the forty shares subscribed and the $1,000 for capital stock, paid into the plaintiff's treasury on or before July 11, 1895, established it. It was enabled to make any contract within the scope of its powers. That is settled by the plain language of 25 & 26 Vict. c. 89, § 18, quoted above. But it also has been expressly so decided. It was said in *Salomon* v. *Salomon*, [1897] A. C. 22, at p. 51: " When the memorandum is duly signed and registered, though there be only seven shares taken, the subscribers are a body corporate ' capable forthwith,' to use the words of the enactment, 'of exercising all the functions of an incorporated company.' Those are strong words. The company attains maturity on its birth. There is no period of minority — no interval of incapacity." This apparently demonstrates the error of the further statement in 1 Morawetz, Corp. (2d ed.) 279, that " Before any shares were issued the existence of the corporation was a fiction." The remark of Lord Cairns (3 App. Cas. at p. 1239) to the effect that the contract for the sale of the island was " provisional on the shares being taken and the company completely formed" was made in connection with the defense of laches and not in the discussion as to the liability of the defendants (which he had concluded on an earlier page), and refers only to the fact that the scheme of the defendants to get £80,000 in cash out of the new company under their contract with it was dependent as a practical matter on the shares being taken by the public, and does not and cannot apply to the phraseology of the contract itself, for respecting that it is not correct. The only conditions named in the contract were that the company should be registered and confirm the contract and the contract of the syndicate with the official liquidator be performed. (See 5 Ch. D. 75, 76 and 95.) The distinction which appears to be established between the Erlanger case and the present one, by the decision of the United States Supreme Court, 210 U. S. 206, is that if promoters organize a company with a capital of $3,750,000 and sell to it through their dummy directors property

bought by them for this purpose, for $3,250,000, in paid up shares, and then get by public subscription $500,000 for working capital, the transaction is valid. But if promoters, having bought property for £55,000, organize a company with a capital of £130,000, and while they are the only *bona fide* stockholders by vote of their directors sell to it their property for £110,000, to be paid £80,000 in cash and £30,000 in paid up shares, £100,000 being subscribed in cash by the public, the transaction is void. The only difference between the two cases is that in the Erlanger case the promoters were paid a part of the purchase price in money, the proceeds of public subscription, and received paid up shares, which they took in payment of the balance of the purchase price when the stock was issued to subscribers, while in the present case the whole purchase price was paid in stock, which was issued before any stock was issued to the public although after a substantial public subscription. In other words, the order in which the transaction is carried out, and not its substantial nature, makes the difference between liability and immunity of the promoter. It is true that in the Erlanger case, until after ratification by the company of the contract previously made in its behalf for the purchase of the lease of the island, the mayor of London by acting as a director was liable to take shares of stock and intended to, and did subsequently, take and pay for fifty shares. He and possibly one other (3 App. Cas. 1228) appear to have been the only persons up to that time connected with the company, who subsequently became stockholders, who were not agents of the promoters. But it is also the fact (as stated by Jessel, M. R., in 5 Ch. D. at p. 112) that "Up to this time there was not really a single *bona fide* shareholder distinct from the promoters," and of course all these assented to the transaction. If this is a vital circumstance, that case is distinguishable in principle from the one at bar and from the case decided by the United States Supreme Court. This appears to us to be a difference upon an immaterial matter. It is of no consequence whether in fact the dummy directors know of the terms of sale and the breach of trust of the promoters. It does not appear in the present case that the nominees of Bigelow and Lewisohn knew any more about the profit the latter were making than did the directors of the New Sombrero Company of

the profits of the syndicate. The point is that in both cases the directors were selected with the purpose that they should be the mere instruments of the promoters, and they carried out the will of their masters. Under the English statute the instruments of the promoters in the New Sombrero Company, while its directors, were as fully clothed with all the powers of the corporation and as much the holders of all its stock as were the seven directors of the plaintiff holding in all forty shares of the plaintiff at the time the contract of sale in the present case was made. If the assent of all the stockholders is good in the one case, by the same token it should be equally good in the other; and the breach of trust in the one is equally a breach of trust in the other. This case seems to us an authority in favor of the plaintiff.

In *New Sombrero Phosphate Co.* v. *Erlanger*, 5 Ch. D. 73, 123, it was said by Baggallay, L. J.: " The syndicate were, in substance, not only the vendors of the property, but also the promoters of the company, and in such a case the syndicate, as promoters, being in a fiduciary relation to the company, it was essential that the public, who were invited to become, and who were expected to become, the shareholders of the company, and to constitute the company, should have the fullest information as to all the surrounding circumstances." See also Jessel, M. R., *S. C.* at p. 113. In *In re British Seamless Paper Box Co.* 17 Ch. D. 467, at p. 471, it was said by Jessel, M. R.: " If promoters make an arrangement to get a profit for themselves out of what is apparently paid to the vendors, it is immaterial whether the contract with the vendors is approved of by the directors of the company, who are the promoters, just before the allotment or just after: in both cases it is intended to cheat the future shareholders; and of course it makes no difference whatever that the persons who, at the time the allotment was made, were in fact the promoters or their nominees, knew of the fraud. You can defraud future allottees as well as present allottees." In the same case on appeal Cotton, L. J., said (17 Ch. D. at p. 479): " The directors stand in a fiduciary relation to the whole company, that is, not only to the existing members but to all whom they intend to bring in." In *Broderip* v. *Salomon*, [1895] 2 Ch. 323, at p. 329, it was said by Vaughan Williams, J.

(whose conclusion was approved in *S. C. sub nomine Salomon* v. *Salomon*, [1897] A. C. 22): " Of course, purchasing at an exorbitant price may be a fraud, even if all the shareholders know of it, if there is an intention to allot further shares at a later period to future allottees." This point was apparently left open in the House of Lords, [1897] A. C. at p. 37. In *In re Leeds & Hanley Theatres of Varieties*, [1902] 2 Ch. 809, at p. 823, occurs this language: "At first there were only four directors . . . and the seven necessary signatories of the memorandum of the association. When it is said that the promoters stood in a fiduciary position towards the company, that does not mean that they stood in such a relation to these directors and these seven signatories. It means that they stood in a fiduciary relation to the future allottees of shares — to the persons who were invited to come and take up the shares of the company." In *Gluckstein* v. *Barnes*, [1900] A. C. 240, 257, Lord Robertson says : " The people for whom these gentlemen [the promoters] were bound to act were their coming constituents, the persons out of whose money they proposed to make their gain." In *Densmore Oil Co.* v. *Densmore*, 64 Penn. St. 43, at p. 50, it is said : " Where persons form such an association, or begin or start the project of one, from that time they do stand in a confidential relation to each other, and to all others who may subsequently become members or subscribers, and it is not competent for any of them to purchase property for the purposes of such a company, and then sell it at an advance without a full disclosure of the facts." This language is quoted with approval and applied in *Burbank* v. *Dennis*, 101 Cal. 90, 98, and in *South Joplin Land Co.* v. *Case*, 104 Mo. 572, 580. To the same point, *Pittsburg Mining Co.* v. *Spooner*, 74 Wis. 307, 321–323. In *Pietsch* v. *Milbrath*, 123 Wis. 647, at p. 656, it is held that "Persons who act as promoters of a corporation do not necessarily cease to be such when the corporation is organized to do business. . . . So long as there are prospective original subscribers for stock and the promoters and those concerting with them remain in control of the corporation, it is in a position to be deceived. . . . It is deceived in a legal sense when it is rendered helpless by its managers as to protecting those invited to subscribe for its stock, and is then used to aid in defrauding them." This is supported

by *Fred Macey Co.* v. *Macey*, 143 Mich. 138, 152, a case singularly like the one at bar in its essential features, where relief was granted to the corporation against the promoters although they subscribed for all the capital stock. Other cases which in principle reach the same result are *Yeiser* v. *United States Board & Paper Co.* 107 Fed. Rep. 340, 348; *London Trust Co.* v. *Mackenzie*, 62 L. J. Ch. (N. S.) 870; *Hinkley* v. *Sac Oil & Pipe Line Co.* 132 Iowa, 396. It was said in *Groel* v. *United Electric Co.* 4 Robbins, 616, 622: "There can be no question that promoters are liable to the corporation for profits secretly made by them in its promotion, and that such liability arises in cases where future allottees of stock are concerned. *Knoop* v. *Bohmrich*, 4 Dick. 82. *Plaquemines Tropical Fruit Co.* v. *Buck*, 7 Dick. 219. *Loudenslager* v. *Woodbury Heights Land Co.* 13 Dick. 556, affirming the principle established in the court of chancery in *Woodbury Heights Land Co.* v. *Loudenslager*, 10 Dick. 78." In *Central Trust Co.* v. *East Tennessee Land Co.* 116 Fed. Rep. 743, and *Camden Land Co.* v. *Lewis*, 101 Maine, 78, 95, *Hayward* v. *Leeson*, 176 Mass. 310, to this point is cited with approval. *St. Louis, Fort Scott & Wichita Railroad* v. *Tiernan*, 37 Kans. 606, and *Stewart* v. *St. Louis, Fort Scott & Wichita Railroad*, 41 Fed. Rep. 736, were both decided on the assumption that the promoters took all the stock, although it appears that later some stock was issued to municipalities through which the tracks of the promoted railroad corporation ran, but whether as a part of the original plan of promotion does not appear, and no weight is attached to this circumstance in the opinions. Numerous other cases which have been cited do not bear upon this point for the reason that in each of them the owners of the property conveyed have owned either the entire capital stock of the corporation or all that it was contemplated to issue. See *Foster* v. *Seymour*, 23 Fed. Rep. 65; *McCracken* v. *Robison*, 57 Fed. Rep. 375; *Barr* v. *New York, Lake Erie & Western Railroad*, 125 N. Y. 263; *Blum* v. *Whitney*, 185 N. Y. 232. *In re Ambrose Lake Tin & Copper Mining Co.* 14 Ch. D. 390; *Salomon* v. *Salomon*, [1897] A. C. 22; *In re British Seamless Paper Box Co.* 17 Ch. D. 467; *Seymour* v. *Spring Forest Cemetery Association*, 144 N. Y. 333; *Hutchinson* v. *Simpson*, 92 App. Div. (N. Y.) 382; *Tompkins* v. *Sperry*, 96 Md. 560; *Langdon* v. *Fogg*, 18 Fed. Rep. 5, *Flagler Engraving*

*Machine Co.* v. *Flagler*, 19 Fed. Rep. 468; *Insurance Press* v. *Montauk Fire Detecting Wire Co.* 103 App. Div. (N. Y.) 472; *Higgins* v. *Lansingh*, 154 Ill. 301; *In re Baglan Hall Colliery Co.* L. R. 5 Ch. 346. In all these cases it was also true that no shares were ever issued (so far as appears) other than those to the promoters, except that in *In re British Seamless Paper Box Co.* 17 Ch. D. 467, at a time considerably subsequent to the organization of the corporation, a change in the scheme was made in good faith by which others were brought in as subscribers.

In this respect the question is one of intention of the promoters. If they actually intend at the time the company is brought out to remain its sole owners and that it shall not receive the money of innocent shareholders in the future, then although thereafter the exigencies of the company may be such as to require the issue of additional stock, they may not be responsible. *In re British Seamless Paper Box Co.* 17 Ch. D. 467, is an illustration of this principle. There it was found that the promoters were and intended to remain the sole proprietors of the property of the company and the sole members of the company. Cotton, L. J., at p. 479, said : " Here it is an established fact that when the company was formed it was intended to be a private company, that is, it was intended to carry it on without calling in the public, or issuing any shares except to the then existing shareholders. Therefore the doctrine that directors may not take a profit for themselves is inapplicable, because all the members knew that they intended to make a profit. It is true that some new members were subsequently taken in. If shortly after this transaction a prospectus had been issued and the public had been invited to come in and take shares, no court would have listened to directors who said that it was not intended to take in fresh members. But this was commenced and carried on entirely as a private company, and a considerable time elapsed before they asked any one to join them."

In *Wills* v. *Nehalem Coal Co.* 52 Ore. 70, a corporation was organized by promoters with a capital of $150,000. More than half was issued to promoters and their tools in return for property of one of them conveyed at an overvaluation. Afterwards shares were sold to the public without disclosure of the great

profit made by promoters. Relief was granted. The contention that the corporation had assented with full knowledge of the facts by all who were the stockholders at the time of the sale was disposed of on the ground that in substance a wrong was done the corporation in diminishing the common fund held for the benefit of all the stockholders by issuing a part of its capital stock for property worth less than its face value. In *Richlands Oil Co.* v. *Morriss*, 108 Va. 288, the facts as stated in the opinion were that the promoters, having acquired the control of certain oil leases for an insignificant price, " proceeded to transfer these leases to a company which they organized upon a capitalization of 1,000,000 shares (the par value of each share being $1), and distributed 600,000 of those shares to themselves; and having perfected the organization of the company by making themselves the president, secretary, treasurer, and directors undertook to market the residue of the shares of stock, amounting to 400,000, without informing the public as to the true condition of affairs." The suit of the corporation was upheld. Upon the point we are now discussing these two cases are indistinguishable in principle from the cases at bar.

This review of decisions seems to establish abundantly the proposition that promoters stand in a fiduciary position toward the corporation, as well when as a part of the scheme of promotion uninformed stockholders are expected to come in after the wrong has been perpetrated, as when at that time there are shareholders to whom no disclosure is made. We find no authority opposed except the Lewisohn cases in the federal courts (210 U. S. 206).

If the question is examined on principle apart from authority, the same result appears clear. The starting point is that a promoter is a fiduciary to the corporation. To use the words of Lord Cairns in *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218, at p. 1236 : Promoters " have in their hands the creation and moulding of the company: they have power of defining how, and when, and in what shape, and under what supervision, it shall start into existence and begin business." The corporation is in the hands of the promoter like clay in the hands of the potter. It is to this person, absolutely helpless and incapable of independent initiative or uncontrolled action, that the promoter

stands as trustee. It is not necessary to inquire how far he may be trustee also for shareholders or associates. In the present case the inquiry relates wholly to his obligation to the corporation. The fiduciary relation must in reason continue until the promoter has completely established according to his plan the being which he has undertaken to create. His liability must be commensurate with the scheme of promotion on which he has embarked. If the plan contemplates merely the organization of the corporation his duties may end there. But if the scheme is more ambitious and includes beside the incorporation, not only the conveyance to it of property but the procurement of a working capital in cash from the public, then the obligation of faithfulness stretches to the length of the plan. It would be a vain thing for the law to say that the promoter is a trustee subject to all the stringent liabilities which inhere in that character and at the same time say that, at any period during his trusteeship and long before an essential part of it was executed or his general duty as such ended, he could, by changing for a moment the cloak of the promoter for that of director or stockholder, by his own act alone, absolve himself from all past, present or future liability in his capacity as promoter. The plaintiff was fully organized and authorized to do business on July 8 and 11, 1895, when only $1,000 in capital stock had been paid in. It would be an idle ceremony indeed to establish for promoters the obligations of trustees, and at the same time hold that by their tools and with only $1,000 paid in, and that as a mere form (for it was soon after repaid to one of them) they could vote to themselves a wholly unwarranted profit of $1,250,000, kept secret from other initial shareholders, because at that moment they were the only stockholders. By such a course the law would be holding out apples of Sodom to the wronged corporation. Corporations can be formed through irresponsible agents with ease. If these agents can vote away a substantial part of the capital stock for property of comparatively small value, and still with immunity to themselves and their principals receive from the uninformed public cash subscriptions for the rest of the capital stock, the organization and management of corporations might readily become a " system of frauds." *Peabody* v. *Flint*, 6 Allen, 52, 55. It is answered that the plaintiff has assented to the

transaction with full knowledge of the facts. But it has not assented when it stood where it could act independently. The assent to the wrongful act of the promoters was given at the behest and by vote of the promoters themselves, while still occupying the position of protectors to their own creature, while it was bound hand and foot by them and prevented from taking any action except through them as a step in its further exploitation, and while their trust was uncompleted. The corporation although by law fully organized was still in its swaddling clothes, so far as the plans of the promoters were concerned. The value of their stock taken in return for their mining property was dependent in a substantial degree upon the corporation having $500,000 in cash for a working capital. They could not perfect their plans nor reap their contemplated profit, except by retaining their hold upon the corporation until the public had made this contribution. In one sense it is true that the plaintiff was completely organized on July 11 and on September 20, 1895. It was fully competent to be bound by its contracts and ratification of contracts with those dealing with it at arm's length. But it was not free from its wardship to its promoters, whose scheme from the first looked forward to a corporation with treasury filled by subscriptions from the unenlightened public. The corporation was not dealing with these fiduciaries upon an independent ground. The plaintiff, although a legal corporation from July 8, leaned wholly upon its promoters, because they made it so to lean, until long after the events here in controversy. An assent under these conditions can be of no greater effect than the assent of a minor under guardianship to the breaches of trust of his guardian.

The situation is akin to the conveyance of property by a man solvent but in contemplation of insolvency. Such conveyance is not wrong until the contemplated indebtedness is incurred which makes him an insolvent. Then the executed evil intent stretches back and invalidates the original conveyance. Here the conveyance to the corporation with the secret profit, when there are no uninformed subscribers to stock, if nothing more is ever done, is not an actionable tort. But the vicious intent looks forward to the procurement of money from the ignorant public by means of original subscriptions and the execution of

this evil intent extends backward to contaminate the sale and its profit.

Stress has sometimes been laid upon the fact that the promoters were paid a part of their purchase price out of the public subscriptions. But there is no difference in principle between such a case and the present, where a substantial part of the value of the stock taken by the defendant and Lewisohn depended upon the cash subscriptions to be made by the public for the remaining shares not issued to the promoters.

But it is further argued that, the entire capital stock outstanding at the time being in the hands of the promoters, the sale of the property to the corporation was merely changing the form of title of the promoters from owners of real estate to that of shares of stock, and that, there being then no other shareholders, no wrong was done. It has been decided that where persons own the entire authorized capital stock of the company and take it in payment for the conveyance of their property at a grossly exaggerated price, nobody can be heard to complain. The leading English cases upon this point are *In re Gold Co.* 11 Ch. D. 701, *In re Ambrose Lake Tin & Copper Mining Co.* 14 Ch. D. 390, *In re British Seamless Paper Box Co.* 17 Ch. D. 467, and *Salomon* v. *Salomon*, [1897] A. C. 22. But these and many other like cases cited on pages 185 and 186 *ante* are where the promoters owned all the outstanding capital stock and intended to remain the sole proprietors and did not purpose that there should be, as a part of the promotion plan, a substantial issue of stock for cash to the public. This is pointed out in *London Trust Co.* v. *Mackenzie*, 62 L. J. Ch. (N. S.) 870, 875. The distinction is clear between cases of that class and those like the present, where the promoters took for themselves a large number of shares of stock without adequate consideration and without disclosure to the detriment of the corporation and all its future shareholders, at the same time planning that there should be immediate public subscriptions. It is one thing to take all the shares of a corporation in payment for physical property conveyed. It does not much matter to the stockholders in such a case whether the total is one hundred and thirty thousand shares or one hundred and fifty thousand shares. But it is a very different thing to take $\frac{130,000}{150,000}$ of capital stock of a corporation whose

assets consist of the same physical property, and in addition $500,000 in money subscribed by others. The latter course affects the other stockholders and the corporation itself, and it gives the promoters something appreciably more valuable than what they contribute. It is true that in *Salomon* v. *Salomon* and in some other cases there was a part of the authorized capital stock which was not issued, but it was not proposed to be issued as a part of the scheme of promotion and the original share-holders intended to remain the only shareholders. It was to be issued or not in the remote future, as the exigencies of the cor-poration in the actual conduct of its business might require, but, in any event, it was not to be issued for the purpose of starting the corporation on its course. This circumstance materially affects the question here to be considered. Most, if not all, corporation laws provide in some form for an increase of capital stock. It is of no consequence upon such a point as this, whether the capital stock originally authorized is large but not all issued or whether it is at first small and subsequently an in-crease is authorized. This seems to be the view taken by the English courts, for it is said by James, L. J., in *In re British Seamless Paper Box Co.* 17 Ch. D. 467, " If they [the promoters] were intending, although then constituting the whole company, that other people should come in afterwards to whom what had been done would be injurious, the court would feel no diffi-culty in saying as Lord Langdale did in *Society of Practical Knowledge* v. *Abbott,* 2 Beav. 559, that they intended to commit a fraud."

The fundamental reasoning upon which these cases can rest is not that no wrong has been committed, but there is no one to enforce the remedy. All courts recognize the soundness of the doctrine that no man can be on both sides of the same bargain with justice to all interests. The principle that one cannot rightfully sell property, belonging to him in his private right, to himself in a trust capacity is universal.

If this aspect alone is looked at and the corporation is regarded as a distinct person, it cannot be said that the corporation is not wronged by such a breach of duty by promoters. It is only when the corporate personality is disregarded and its component elements as stockholders alone are considered that it can be said

that no harm is done on the ground (as was said in *Salomon* v. *Salomon*, [1897] A. C. at p. 57) that " the company is bound in. a matter *intra vires* by the unanimous agreement of its members." But looking through the form of the corporation to the stockholders and treating them as the corporation is an exception to the otherwise firmly established universal rule that the corporation is a separate legal entity for all purposes, even though all its stock be held by a single interest and it be to all practical intents merely the instrument of the stockholder. *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406. *Peterson* v. *Chicago, Rock Island & Pacific Railway*, 205 U. S. 364, 390. We perceive no reason for extending this exception to a case like the present.

The real ground of the decisions of which *Salomon* v. *Salomon* is a type is that the corporation is estopped by the circumstance that all persons with financial concern in the matter have assented with knowledge, and thus the lips of everybody are sealed. It is not that no wrong has been done, but that whatever wrong has been done has been condoned. The maxim " *Volenti non fit injuria* " is invoked. This, however, is setting up confession and avoidance and not a bar to the main cause of action.

The theory upon which corporations are founded is that they are artificial persons, distinct and separate from officers and stockholders. Corporate liabilities do not attach to the latter. The wrong which the defendant and his associate did in this case was in selling property worth intrinsically \$1,000,000 and in the market at most \$2,000,000 for \$3,250,000 without revealing that they were making a secret profit. The wrong was done to the corporation. It affected all its shareholders, present and future alike. It is generally admitted that if there are existing stockholders ignorant of the wrong, redress may be had. But it is had through the corporation or for the benefit of the corporation and not by the stockholder in his own right. The wrong is not done to the shareholders as individuals, nor to the shareholders collectively, it is done to the corporation as an independent being, and thus indirectly the rights of those who are or who may become stockholders are affected. In buying the promoters' mine, the directors of the corporation acted for the corporation,

as such, without regard to who were the then stockholders, or even if there were no stockholders. Whoever becomes an originally contemplated shareholder coming in afterwards has as much right to say that the rights of the corporation were not protected and to insist that it should assert its remedy for the wrong done it, as one in at first but not informed. Subsequent subscriptions to original stock as a part of the scheme of promotion do not change the identity of the corporation, but remove an impediment to the enforcement of a remedy for a wrong previously done the corporation. The wrong is not done when the innocent public subscribes, but when the sale was made to the corporation at a grossly exaggerated price with secret profit. The occasion for complaining of this wrong comes when the promoters issue to the public the balance of the stock in order to provide the money necessary to set the corporation on its feet and to give thereby the contemplated value to the stock taken by themselves in payment for their mines. The exemption of the promoter from liability to the corporation for a sale without disclosure when he takes the entire issue of capital stock is an exception to the general rule imposing upon him the liabilities of a trustee. If this exception is to be extended to a case like the present, it leaves nothing of substantial value in the original rule. It might still reach small and grosser forms of want of fidelity to corporations, but would leave unharmed the vastly greater and more refined variety illustrated by the present case. It would point the way to general immunity for the wary.

It is also urged that the maintenance of this suit works an injustice to the defendant in requiring a repayment to the corporation, which will result in a benefit to the thirteen fifteenths of the capital stock taken by the defendant and Lewisohn (who condoned the wrong) as well as to the two fifteenths subscribed for by the innocent public. The size of the repayment which may be required of the defendant is due to the enormous profit taken at the outset. Apart from the unjust profit taken by the promoters, their interest in the plaintiff was only eight seventeenths, or, tested by the cost and intrinsic value of the property conveyed, four seventeenths. The true answer, however, is given by Jessel, M. R., in *New Sombrero Phosphate Co.* v. *Erlanger*, 5 Ch. D. 73, at p. 114. "It is said that is not doing justice, and

that the suit cannot be maintained in this form, because it will not do justice. But that argument goes too far, because it would apply to a case of the grossest fraud in every instance in which one or more of the actual shareholders of a company took part in that fraud. If the argument were once allowed to prevail, it would only be necessary to corrupt one single shareholder in order to prevent a company from ever setting the contract aside. It may be said you give to the shareholder, who was a party to the fraud, a profit, because he will take it in respect of his shares, and since as between co-conspirators there is no contribution, therefore his brother conspirators, who are made liable for the fraud, cannot make him repay his proportion. But the doctrine of this court has never been to hold its hand and avoid doing justice in favor of the innocent, because it cannot apportion the punishment fully amongst the guilty. A dozen parties to a fraud may be defendants, and one decree or judgment go against all, and if it is a fraud of such a character that none of them can bring an action for contribution, the plaintiff may at his will and pleasure enforce that judgment against any one of them, and perhaps pass over the most guilty of them; still there is no remedy as between those who commit the fraud. It is one of the punishments of fraud that there is no such remedy, and that a guilty party, though not the most guilty, may suffer the greatest amount of punishment. It is one of the deterrents to men to prevent their committing fraud." See also *Stockton* v. *Anderson*, 13 Stew. (N. J.) 486.

It is said further that the result reached is harsh from the business man's point of view. A discussion of this aspect of the case involves ethical considerations. Courts are constantly dealing with the various relations of the business world. Legal principles are applied to these transactions, but such principles "have almost always been the fundamental ethical rules of right and wrong." *Robinson* v. *Mollett*, L. R. 7 H. L. 802, 817. Upon its distinctly moral side, there is little to the credit of the defendant and his associate. The offering by the defendant as promoter for public subscription for cash at par a substantial part of the capital stock of a corporation, the rest of whose capital stock had been issued for property conveyed to it under a law which permitted such stock to be issued only for the real value

of property, was equivalent to a representation that no fictitious value had been placed upon the property so acquired. But the distinct finding of the single justice is that the real value was less than one third the price for which the defendant and Lewisohn sold it. Nothing can be said in support of a business enterprise carried on by promoters, which involves the purchase by them of mines, costing and intrinsically worth $1,000,000, with money in substantial part solicited from associates on representations that a corporation is to be formed with a capitalization of $2,500,000, of whose stock $2,000,000 is to be issued for the conveyance to it by them of the mines, and the rest for cash; the actual organization of the corporation under the laws of a State which permitted the issuance of capital stock for property conveyed only to the real value of the property, with a capital stock of $3,750,000, of which $3,250,000 is issued as fully paid for the conveyance of the mines; the settlement with a very great majority of the associates on the basis of a sale for $2,000,000 of stock as at first represented, the promoters retaining $1,250,000 of shares as a secret profit, intending also to procure from the public subscriptions for $500,000 of stock in cash at par and actually carrying out this purpose, the promoters themselves during all these manipulations having entire control of all executive offices of the corporation. In the absence of compelling authority, we cannot set the seal of judicial approval upon such business policies. See *Bigelow* v. *Old Dominion Copper Mining & Smelting Co.* 4 Buch. (N. J.), 71 Atl. Rep. at pp. 176 and 177.

Both on authority outside of our own cases and on principle, it appears to us that the defendant should be held liable. But in this jurisdiction the matter does not stand quite on the basis of an original proposition. In two thoroughly considered opinions in recent years, *Hayward* v. *Leeson*, 176 Mass. 310, and *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow*, 188 Mass. 315, this court has held that liability existed in a case like this. It is not necessary to repeat the arguments of these decisions. There is thus added to considerations which otherwise exist, the force of the doctrine of *stare decisis*. One or both of these cases have frequently been cited by courts of other jurisdictions and always with approval until *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn*, 148 Fed. Rep. 1020;

*S. C.* 210 U. S. 206. No arguments have been adduced not considered in those cases, and no points now brought forward were not there discussed. While the rule of *stare decisis* does not prevent the overruling of those cases, they should not be disturbed unless they now appear to be so clearly wrong as to have no sound support. *Mabardy* v. *McHugh,* 202 Mass. 148. It must appear that the law was "misunderstood or misapplied." 1 Kent Com. 475. There was no misconception of the points involved when these cases were decided, nor any lack of discernment in their application to the affairs of corporations. It does not appear that they have become archaic or inapplicable by reason of business evolution since they were announced. On the contrary, the tendency of custom since the first case was decided has been rather in the direction of more strict accountability of those owing duties to corporations and their stockholders. At all events, we perceive no occasion to relax these principles of accountability for breaches of trust. The mere fact that the Supreme Court of the United States has since decided the question differently is not alone a sufficient consideration for reversing our decisions. It is only when the reasoning of its decision is of convincing power and compels the conclusion that our cases were wrongly decided that it must command our support in other branches of the law than those where it is supreme under the Federal Constitution. With great respect to the decision in 210 U. S. 206, we are constrained to adhere to the law as laid down in the earlier cases in this Commonwealth.

We have discussed the question as if the same legal principles are involved now as were presented upon the demurrer. There are, however, certain aspects of the evidence which seem to us to make it essentially different and materially stronger for the plaintiff. When the votes to purchase the mines of the promoters were passed on July 11, only forty shares of stock had been subscribed for or issued. The votes were passed by the directors alone and there was no vote by the stockholders at this time. It is true that the directors comprised all the stockholders, but on that date they were acting wholly in their capacity as directors, that is, as trustees. They did not attempt, so far as any records show, to shift their character as trustees for that of

individual stockholders. They did not pursue the careful course of separation of these dual capacities by calling a stockholders' meeting, which was followed in *North-West Transportation Co.* v. *Beatty*, 12 App. Cas. 589, nor did they assent in writing as stockholders. So far as the records show up to this point, there was only a directors' vote for the purchase. Moreover, the records of the plaintiff show that at the opening of this meeting only six of the seven directors were present. Four of these six directors resigned as did also the absent seventh director, their resignations were accepted and their successors were chosen. But of the five newly chosen directors, only two were present and took their seats. Thus there were four directors, a bare quorum and majority, present when the offers for the sale of the mines were presented and the votes for their purchase were passed. These votes to purchase were not consummated until December, 1895, and January, 1896, when the deeds were delivered to the plaintiff. The vote to issue the certificates of stock in payment for the conveyances of mines was passed on September 18, 1895. Under date of July 18, 1895, the only subscription list of the plaintiff was signed. Upon this list appear the names of those outside persons who subscribed for the $500,000 of working capital for the plaintiff. The money was paid by some of the outside stockholders before September 18, and at least as early as September 10, 1895. Stock certificates were made out for the number of shares allotted to each under date of September 18. The rights of all these persons as subscribers had become fixed at least as early as September 10, 1895, before which date the subscriptions were all received, and when notices of their acceptance and demands for payment were sent out. These circumstances amply support the finding of the single justice that issuance of the twenty thousand shares to the public was in the summer or fall of 1895. These stockholders were entitled to have a disclosure made to the corporation through independent officers. There is no pretense that any disclosure was made to these subscribers. On September 18, 1895, the directors of the plaintiff voted to issue the stock as before stated — thirty thousand shares to Bigelow and Lewisohn, one hundred thousand to their nominee Dumaresq, and there was made out the certificate for the remaining twenty thousand

shares to "Thomas Nelson, Treasurer," and these four, professing to represent all the stock of the plaintiff, signed the written approval of all previous acts of the directors. This is the first attempt of the stockholders to act respecting this subject. As before pointed out, the certificate to Nelson was wrongfully issued; except 'as it belonged to outside subscribers, it was treasury stock. There were then other stockholders of the plaintiff who had paid for their stock, although they had not received their certificates, but the plaintiff had their money and they were entitled to be treated as stockholders. *Chester Glass Co.* v. *Dewey,* 16 Mass. 94. *Chaffin* v. *Cummings,* 37 Maine, 76. *Hawes* v. *Anglo-Saxon Petroleum Co.* 101 Mass. 385, 395. Their certificates were dated September 18, 1895, and issued directly. These circumstances show that at the first and only time when there was an effort on the part of the promoters to secure a ratification of their wrongful acts, there were certain shareholders who were not represented and who did not themselves sign in assent and who were in fact ignorant of the wrong done the corporation. Further, they do not show that at any time from the organization of the corporation onward was there a moment when all the stockholders or directors knew of the material facts as to the defendant's relation to the corporation. In this view of the facts, which is supported fully by the evidence, there appears to be no assent by the corporation with knowledge of the facts by all those who at any time constituted all the stockholders, except by assuming the knowledge of Bigelow and Lewisohn on July 11, 1895, when there were only forty shares of stock for which the latter had paid, to be the knowledge of all the stockholders, although there were then seven shareholders as to whose actual knowledge of the scheme there is no evidence, although all were the tools of the defendant and Lewisohn. It is only by treating these subscriptions as a sham that knowledge even of the owners of the forty shares can be found. But these subscriptions were necessary to the organization under the New Jersey law. Hence the rule of *Salomon* v. *Salomon,* [1897] A. C. 22, and like cases has no application to these facts, nor does the difficulty meet "the petitioner at the outset that it has assented to the transaction with the full knowledge of the facts," (210 U. S. 211, 212,) unless it is said that in fact knowledge by

the plaintiff's dominant stockholders is knowledge by the corporation.   But the defendant was committing a breach of trust on his principal, the plaintiff, and where one is committing a wrong in his own interest his knowledge does not bind the corporation, which might in an innocent transaction be affected by his knowledge.   *Indian Head National Bank* v. *Clark*, 166 Mass. 27. *Produce Exchange Trust Co.* v. *Bieberbach*, 176 Mass. 577, 588. These considerations mark the case as different in material respects from that which was stated in *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn*, 210 U. S. 206, and bring it clearly within the well recognized rule of promoters' liability, laid down in the numerous and undisputed cases, before cited. The Supreme Court of the United States has never passed upon these facts nor upon such a case as is thus presented.   We know of no authority which countenances a different decision upon them than that here reached.   The conflict between the federal courts and this court in this respect appears to be not upon the merits of the case as disclosed upon the present record.   See *Bigelow* v. *Old Dominion Copper Mining & Smelting Co.* 4 Buch. (N. J.), 71 Atl. Rep. 153, 175.

But there is still another aspect in which the case differs from that presented in the federal court and in our previous decision. The defendant held out to subscribers of his syndicate, before the incorporation of the plaintiff, that its capital stock was to be $2,500,000 and that they would get for one share in the Baltimore Company two in the new company and that the rest would be sold to furnish the working capital.   The right of these parties to become stockholders in the plaintiff company was fixed before its first meeting of stockholders was held, because they had signed the syndicate agreement and had made two payments on account of their subscriptions.   They were sharers thus in the profit of $1,000,000 above the costs of mines.   But they were also entitled to disclosure of the secret profit of $1,250,000 more taken by the defendant and Lewisohn and it is found that most of them were ignorant of it.   Respecting any sale to the plaintiff in which they had agreed to become shareowners on any other basis than that of two for one, they were entitled to disclosure.   This is quite aside from any rights they may have had against Bigelow for not treating them fairly on the division of profits.   It stands

on different ground. In that relation they were sharers in promoters' profits and they received what they expected. But they had also agreed to be subscribers to stock of the plaintiff. In that character they were not promoters, but stockholders and entitled to all their rights. That they knew there was to be a sale for $2,000,000 and a profit of two for one was no reasonable ground for expectation that the defendant would take a large additional secret profit. As to this secret profit, the members of the syndicate had the same rights as the outside public, that is, they were entitled to a disclosure to an independent and impartial board of officers who should be in a position to act for the interests of the corporation as opposed to those of the promoters. In this regard the case is like *Arnold* v. *Searing*, 3 Buch. (N. J.) 262, where the defendants were held liable.

4. It is argued that, even though the ratification in writing be disregarded, still the acts of the stockholders of the plaintiff after some of them knew of the fact that there was some profit to Bigelow and Lewisohn beyond that accruing to all the other members of the syndicate has amounted to a ratification. The complete answer to this argument is that the single justice has found that until shortly before the bringing of these suits neither the stockholders nor the company had gained any knowledge as to the facts upon which the claim is now based, that the very great majority of the stockholders never knew or assented to the operations by which the secret profit was obtained and did not have knowledge of or access to the books or records of the corporation. The votes of ratification of 1899 and 1901 being passed under these conditions do not bind the plaintiff.

5. Several other objections are made to the granting of relief to the plaintiff. It is urged that the plaintiff ought not to recover because, a large majority of its stock being held by a Maine corporation, an agreement has been entered into by that corporation and certain trustees by which it was attempted to provide for the conduct of these suits and sequestrate the proceeds to holders of negotiable certificates. But this agreement is one to which the plaintiff is not a party, and it was made long after these suits were instituted. If it is illegal, it may be set aside in appropriate proceedings, but the rights of the plaintiff

for the benefit of all its stockholders cannot be refused enforcement on such ground.

6. The defence of laches cannot prevail.  It is found as a fact that as soon as the defendant and his associates released their absolute control of the plaintiff, the action was seasonably begun. The plaintiff is held to the exercise of diligence after the discovery of the facts, but there can be no laches so long as there is no knowledge of the wrong complained of and no failure to avail one's self of reasonable opportunities to ascertain the facts.  So long as the plaintiff was wholly in the power of the defendant, it could not be charged with knowledge.  Mere lapse of time is no bar to relief under these circumstances.  *Lydney & Wigpool Iron Ore Co.* v. *Bird*, 33 Ch. D. 85.  *Lagunas Nitrate Co.* v. *Lagunas Syndicate*, [1899] 2 Ch. D. 392, 433.  *Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587.

7. Nor is the statute of limitations a bar.  The time limited by the statute does not begin to run against a breach of trust, where there is a fiduciary duty to disclose the facts on which the cause of action rests, until the facts have or ought to have been discovered.  *Atlantic National Bank* v. *Harris*, 118 Mass. 147.  R. L. c. 202, § 11.  The ground of the defendant's liability is his breach of trust as a promoter.

8. It follows from what has been said as to the nature of the wrong done by the defendant that he is liable *in solido*.  The act of the defendant and Lewisohn was a joint act for the benefit of both.  Their subdivision of the profits made cannot affect the right of the plaintiff.  The breach of trust, which they as promoters committed, was in the nature of a tort.  This renders them liable severally as well as jointly and for the whole damage.  *Hayward* v. *Leeson*, 176 Mass. 310, 324, and cases cited. 188 Mass. at p. 329.  *Feneff* v. *Boston & Maine Railroad*, 196 Mass. 575, 581.  *Gluckstin* v. *Barnes*, [1900] A. C. 240.  *Bigelow* v. *Old Dominion Copper Mining & Smelting Co.* 4 Buch. (N. J.), 71 Atl. Rep. 153, 176.

9. As to the character of relief which can be afforded, it is said first that rescission is the only remedy open to the petitioner.  The single justice has found that the situation of the parties and the properties is not such as to make it just at this time to order a rescission.  The evidence justifies this finding.

It was decided in this case at its earlier stage, 188 Mass. 315, 329, that rescission is not the only remedy.    *Hayward* v. *Leeson*, 176 Mass. 310, 321.    *Parker* v. *Nickerson*, 137 Mass. 487.    We are not disposed to question the correctness of the decision upon this point.    When one has committed a breach of trust, there is no occasion to be over-solicitous to see that the faithless fiduciary should not make reparation for the wrong done.    *In re Olympia*, [1898] 2 Ch. 153, 169.    *Lyndney & Wigpool Iron Ore Co.* v. *Bird*, 33 Ch. D. 85, 94.    The essence of the suit is that a secret profit was taken by the promoters.    The obvious remedy is a return of the secret profit.    The difficulty of ascertaining the amount of that profit, which troubled the court in *In re Cape Breton Co.* 29 Ch. D. 795 does not exist here.    See *Bentinck* v. *Fenn*, 12 App. Cas. 652; *Gluckstein* v. *Barnes*, [1900] A. C. 240; *In re Leeds & Hanley Theatres of Varieties*, [1902] 2 Ch. 809; *Yale Gas Stove Co.* v. *Wilcox*, 64 Conn. 101.

10. The plaintiff has also appealed from the decrees in its favor.    It presses its appeals on the ground that it is entitled to recover the difference between the market value of the shares received by the defendant and Lewisohn and the cost to them of the property conveyed to it.    This is the measure of recovery where there is a fiduciary relation at the time of the purchase. But there is no finding here that such relation existed at the time the defendant and Lewisohn purchased the property. There is no evidence which requires such a finding.    The corporation was not organized until a considerable period after the options had been secured.    The defendant and Lewisohn were, during all this time, free to do as they chose with their purchase so far as the plaintiff was concerned.    This has been before decided, 188 Mass. 321.    The plaintiff contends in the alternative that its measure of damage is the difference between the intrinsic value of the property conveyed and the value of the stock issued therefor.    Market value is the standard commonly applied where property has such value.    It is only in cases where the value of property cannot be fairly ascertained by the application of this test that resort is had to any other.    The single justice appears to have experienced no difficulty in determining that value of these mines.    There are no exceptional

circumstances which call for the application of any other than the ordinary rule.

11. Since the decision of this case on demurrer, reported in 188 Mass. 315, and the entry of the decrees by the single justice after a full hearing upon the facts, the defendant has been permitted to file a supplementary answer. *Old Dominion Copper Mining & Smelting Co.* v. *Bigelow,* 199 Mass. 488. He there sets up, as a bar to the plaintiff's claim, a judgment of the Circuit Court of the United States for the Southern District of New York, entered on July 23, 1908, in favor of the defendants in a suit like one of the present suits in all particulars, except that it was prosecuted against the executors of the will of Lewisohn, the defendants' demurrer to the plaintiff's bill being sustained and the final decree being entered, whereby the claim against Lewisohn was held to be without foundation, and he contends that the matter is thereby *res judicata* as to himself. The supplemental answer further avers that the issues were the same as those here involved, and that the present defendant was a privy to the judgment in that case, and participated in the defense, and acted with Lewisohn's executors throughout the entire pendency of the suit. The Lewisohn suit was heard in the Circuit Court of the United States and on appeal in the United States Circuit Court of Appeals, and afterwards upon certiorari in the Supreme Court of the United States. 210 U. S. 206. On these supplemental answers a hearing was had before a single justice, who reserved questions arising thereon for the consideration of this court upon the pleadings and all the evidence.

One of the two suits before us seeks to set aside the conveyance of the outside properties and secure the return of the thirty thousand shares of capital stock issued therefor, and the other to recover damages resulting from the conveyance to the plaintiff of the mines and other real estate of the Baltimore Company for the excessive valuation of one hundred thousand such shares. In other respects the two bills are alike. Two suits (the bills in which have the same allegations as these, *mutatis mutandis*), were brought against the executors of Lewisohn in the United States Circuit Court for the Southern District of New York. The one relating to the outside properties and the issue of the

thirty thousand shares was decided ultimately by the United States Supreme Court, and a final decree was entered dismissing the suit.    In the other suit respecting the issue of one hundred thousand shares for the mines and other real estate of the Baltimore Company, no decree has been entered, and it appears to be still pending.    Separate offers of sale were presented and separate votes were passed by the directors of the plaintiff for the purchase of the outside properties for thirty thousand shares of its full paid non-assessable capital stock and for the purchase of the property of the Baltimore Company for one hundred thousand like shares.    Separate votes were also passed to issue the thirty thousand shares to the defendant and Lewisohn and to issue the one hundred thousand shares to Dumaresq.    Probably the defense of *res judicata* cannot apply to the suit respecting one hundred thousand shares, for the suit touching those shares against Lewisohn's executors has never gone to judgment and is still pending. The *res* at issue in that suit, which appears to be somewhat different from that involved in the other, has therefore never become *judicata*.    This circumstance is noted in passing.    In some aspects of the case it may be important and perhaps decisive.    In view of the ground, upon which this opinion is based, however, it makes no difference in the result and we do not further advert to it.

It appears that the fundamental questions in the suit in the federal court were precisely the same as those raised in the present suit relating to the thirty thousand shares and passed upon in 188 Mass. 315.    The present defendant was not a party to the suit in the federal court, but there is evidence that he participated in the defense of it.

The plaintiff objects that the order of the single justice allowing the defendant to file the supplemental answers was erroneous. This order was made in the exercise of judicial discretion, and unless such discretion was wrongly exercised it must stand.    The facts averred in these answers could not have been pleaded when the original answers were filed, for the events they set up have occurred since.    It is urged that the decree in favor of the executors of Lewisohn was entered in the United States Circuit Court before the trial upon the merits in this court, and

might have been pleaded in bar notwithstanding the proceedings in the Supreme Court of the United States upon a writ of certiorari. But even if this be the law, the single justice cannot be said to have erred in permitting the defendant to set up a decree, which rests upon a decision of the court of last resort made after the close of the hearing upon the merits in the present suits. The decree in the federal court, although founded upon a demurrer, may under proper circumstances be a bar to another suit, as well as one founded upon a hearing of evidence. *Yates* v. *Utica Bank,* 206 U. S. 181, 183. *Northern Pacific Railway* v. *Slaght,* 205 U. S. 122, and cases cited at 130. In the view that we take of the case, it is not necessary to discuss other objections urged by the plaintiff to the force of this decree or the similarity of the issues in the two sets of suits.

12. The most important and difficult question is whether the contention of the defendant is sound that the decree of the federal court is a complete bar to the present suits. His argument is that under the law of New York the decree of the Circuit Court of the United States is a bar to the maintenance of another suit for the same cause of action by the same plaintiff against him, and that, under art. 4, § 1, of the Constitution of the United States, the effect given by the law of New York to the decree must be given by this court, in order that it receive the constitutionally required full faith and credit. The constitutional provision is as applicable to a decree of the Circuit Court in the Southern District of New York as to a decree in the State courts. *Deposit Bank* v. *Frankfort,* 191 U. S. 499, 515. *Central National Bank* v. *Stevens,* 169 U. S. 432, 460. The general effect of the decree (except as to matters of law or practice arising under the statutes of the United States, which have no bearing in the present case) is governed by the law of the State of New York where the federal court was sitting. *Hancock National Bank* v. *Farnum,* 176 U. S. 640, 645, citing *Crescent City Live Stock Co.* v. *Butchers' Union,* 120 U. S. 141, 147; *Metcalf* v. *Watertown,* 153 U. S. 671, 676 ; *Pittsburgh, Cincinnati, Chicago & St. Louis Railroad* v. *Long Island Loan & Trust Co.* 172 U. S. 493.

But before we reach the consideration of the effect of the decree and the interpretation that should be given to it under the laws of

New York, there is a preliminary and fundamental question as to the precise meaning of the full faith and credit clause of the Federal Constitution as applied to the circumstances of this case.

An analysis of the defendant's contention shows that his defense of estoppel by *res judicata* rests upon the ground that he was either a party or privy to the New York judgment. It is not and cannot be urged that the New York suit was a proceeding *in rem* as to the plaintiff's cause of action.    It was a personal suit. Except in proceedings *in rem*, there is no such thing known to the law as an adjudication of a cause of action, which can be availed of as *res judicata* by any others than by parties and their privies. The doctrine of *stare decisis* stands on a wholly different ground. The contention is that, even though the court was convinced that its former decision upon the merits was erroneous and desired to correct the mistake by deciding the later case differently, the decision against the plaintiff would prevent such correction of error.    The fact that a party has fully litigated his cause of action in one suit and has been defeated is of no avail in another suit, to which a stranger to the first suit is a party, involving precisely the same issues.    This principle is illustrated by many cases. *Keokuk & Western Railroad* v. *Missouri*, 152 U. S. 301.    *Crescent City Live Stock Co.* v. *Butchers' Union Slaughter-House Co.* 120 U. S. 141, 155.    *Moore* v. *Albany*, 98 N. Y. 396.    *Trimmer* v. *Rochester*, 130 N. Y. 401. *Stone* v. *New York*, 138 N. Y. 124.    *Wallace* v. *Straus*, 113 N. Y. 238.    *Collins* v. *Hydorn*, 135 N. Y. 320.    *Groth* v. *Washburn*, 39 Hun, 324.    *Furlong* v. *Banta*, 80 Hun, 248.

The defendant can prevail on his supplementary answers only upon the ground that he was either a party or privy to the judgment rendered in the United States Circuit Court.    The defendant Bigelow was not a party to that suit, and he does not assert that he was.    The extent of his contention is that he was in privity with the executors of Lewisohn, and therefore entitled to the benefit of the judgment in their favor.

The first matter for determination is this : Does the full faith and credit clause require the courts of all other States to give effect to the law of any particular State, where a judgment may be entered, as to who are privies to such judgment, or does it permit or require the courts of the State where a third person

sets up the defense that he is privy to a judgment entered in the
courts of another State to decide that question according to its
own law? Hence it becomes necessary to inquire what has been
decided by the Supreme Court of the United States, whose de-
cisions upon this as a federal question are binding upon all
State courts.

It was said in *Smithsonian Institution* v. *St. John*, 214 U. S.
19, at pp. 28 and 29: " Without doubt the constitutional require-
ment, art. IV. § 1, that ' full faith and credit shall be given in
each State to the public acts, records and judicial proceedings of
every other State,' implies that the public acts of every State
shall be given the same effect by the courts of another State
that they have by law and usage at home. This is clearly the
logical result of the principles announced as early as 1813 in
*Mills* v. *Duryee*, 7 Cranch, 481, and steadily adhered to ever
since. *Hancock National Bank* v. *Farnum*, 176 U. S. 640, 642."
But the broad language of this decision, as well as the compre-
hensive phrase of the Constitution itself and of the act of Con-
gress in pursuance thereof are to be read and interpreted in the
light of the thing intended to be accomplished, and " of some
established principles, which they were not intended to over-
throw." *Huntington* v. *Attrill*, 146 U. S. 657, 685. Many cases
have arisen in which this phase of the subject has been dis-
cussed. It has been generally held that, no matter how clear
may be the language of the statute, nor how decisive the deci-
sions of the courts, of the sister State, as to the scope and effect
of judgments upon residents of other States, yet in certain as-
pects such judgments may and ought to be narrowly scrutinized
and the constitutional injunction given a reasonable interpreta-
tion. It was said in *Public Works* v. *Columbia College*, 17 Wall.
521 at p. 528: " The clause of the Federal Constitution which
requires full faith and credit to be given in each State to the
records and judicial proceedings of every other State, applies to
the records and proceedings of courts only so far as they have
jurisdiction. Whenever they want jurisdiction the records are
not entitled to credit." This was a case where three of five
partners appeared in an action against the copartnership, the
other two members being non-residents not served with process
and not appearing, and under the law of New York a judgment

could be rendered under these circumstances against the copart-
nership.    But it was held that the absent partners were not
bound by a judgment so entered.    In *D'Arcy* v. *Ketchum*, 11
How. 165, a judgment was entered against a non-resident de-
fendant, who had not appeared or been served with process, in
accordance with a statute of New York, permitting such course
where joint debtors were sued and one only appeared.    This
statute had been adjudged valid by the courts of New York.    It
was admitted that the defendant was a joint debtor with the per-
son served in New York, yet it was held that the Constitution and
act of Congress did not purport to give effect to State judgments as
binding upon non-resident defendants not served with process and
not appearing.    See *Goldey* v. *Morning News*, 156 U. S. 518, 521.

It was said, in the recent case of *Brown* v. *Fletcher*, 210 U. S.
82, 88, that " the constitutional question does not preclude the
courts of a State in which the judgment of a sister State is pre-
sented from inquiry as to the jurisdiction of the court by which
the judgment is rendered.    See the elaborate opinion by Mr. Jus-
tice Bradley, speaking for the court, in *Thompson* v. *Whitman*, 18
Wall. 457.    That opinion has been followed in many cases. . . .
Even record recitals of jurisdictional facts do not preclude oral
testimony as to the existence of those facts."    *Old Wayne Life
Association* v. *McDonough*, 204 U. S. 8, 15.    These principles
are illustrated in application to a variety of facts: for example,
as to whether attachment of property gives power to enter a
judgment of effect beyond the property attached, *Pennoyer* v.
*Neff*, 95 U. S. 714, 730 ; as to the limits of jurisdiction of parish
courts in the settlement of estates, *Simmons* v. *Saul*, 138 U. S.
439, 448 ; as to whether the return of service is sufficient to
confer jurisdiction, *Knowles* v. *Gaslight & Coke Co.* 19 Wall.
58 ; as to whether the judgment is responsive to the issues ten-
dered, *Reynolds* v. *Stockton*, 140 U. S. 254, 265 ; as to whether
an attorney had authority to appear, *Cooper* v. *Newell*, 173 U. S.
555, 566, *Hall* v. *Lanning*, 91 U. S. 160 ; as to whether the
cause of action was such as to give the State court jurisdiction
to render a judgment entitled, according to settled principles of
public and international law, to enforcement by other courts,
*Wisconsin* v. *Pelican Ins. Co.* 127 U. S. 265 ; as to whether judg-
ment rendered upon appearance by prothonotary, authorized by

statute of the State where judgment was entered, was within the terms of a power of attorney, *Grover & Baker Sewing Machine Co.* v. *Radcliffe*, 137 U. S. 287, 295; as to validity of decree of foreign court respecting devolution of real estate within another State, *Clarke* v. *Clarke*, 178 U. S. 186, 195; as to effect of decree for future payment of alimony, *Lynde* v. *Lynde*, 181 U. S. 183; as to whether divorce obtained by the court having jurisdiction of persons of both parties must be recognized in their domiciliary state, *Andrews* v. *Andrews*, 188 U. S. 14, *German Savings & Loan Society* v. *Dormitzer*, 192 U. S. 125, 128; as to effect of foreign divorces obtained *ex parte*, *Bell* v. *Bell*, 181 U. S. 175, *Streitwolf* v. *Streitwolf*, 181 U. S. 179, *Atherton* v. *Atherton*, 181 U. S. 155, *Haddock* v. *Haddock*, 201 U. S. 562; as to whether one was " holder" of note within the meaning of a warrant of attorney authorizing confession of judgment, *National Exchange Bank* v. *Wiley*, 195 U. S. 257, 269; as to whether determination of domicil of deceased person by appointment of personal representatives foreclosed similar inquiry in other States, *Thormann* v. *Frame*, 176 U. S. 350; as to whether service on public officer impliedly authorized to receive service for a foreign corporation, in respect of business transacted by it in one State, was also impliedly authorized to the same extent as to business not there transacted, *Old Wayne Life Association* v. *McDonough*, 204 U. S. 8, 22; as to whether a corporation is really doing business in the State in which service is made, within the rule that it is essential to jurisdiction over a foreign corporation having neither property nor agent in the State that it be doing business there, *Commercial Mutual Accident Co.* v. *Davis*, 213 U. S. 245 and cases cited at 255, *Caledonian Coal Co.* v. *Baker*, 196 U. S. 432; as to whether administration could be granted upon the estate of a living person, *Scott* v. *McNeal*, 154 U. S. 34; as to the sufficiency of service by publication, *Smith* v. *Woolfolk*, 115 U. S. 143 and cases cited, *Clark* v. *Wells*, 203 U. S. 164, 171; as to whether in fact hearing had been granted to one alleged to be an alien enemy, *Windsor* v. *McVeigh*, 93 U. S. 274; as to judgment of foreclosure against alien enemy, *Lasere* v. *Rochereau*, 17 Wall. 437; as to sufficiency of *scire facias* to keep alive a judgment, *Owens* v. *Henry*, 161 U. S. 642; as to legality of constructive service, *Brooklyn* v. *Insurance Co.* 99 U. S. 362, *Freeman* v.

*Alderson*, 119 U. S. 185, *Empire* v. *Darlington*, 101 U. S. 87, *Pana* v. *Bowler*, 107 U. S. 529; as to validity of statute imposing personal liability for local assessment upon non-resident landowner, *Dewey* v. *Des Moines*, 173 U. S. 193; as to sufficiency of any steps necessary to confer jurisdiction, *Howard* v. *De Cordova*, 177 U. S. 609; as to validity of statute authorizing collection of execution for unpaid balance due on stock subscriptions from foreign stockholders in a corporation, *Wilson* v. *Seligman*, 144 U. S. 41; as to whether recital of settlement of cause in a judgment rested on an unfulfilled promissory agreement, *Jacobs* v. *Marks*, 182 U. S. 583; as to whether the State court having once rendered final judgment could without notice re-open case and enter a different judgment, *Wetmore* v. *Karrick*, 205 U. S. 141, 149. In all these cases it was held that judgments of the courts of sister States, valid there, might be refused recognition elsewhere without doing violence to the federal Constitution. This review of some of the decisions of the Supreme Court of the United States shows how full and complete is the inquiry permitted into the circumstances by which it is contended that the judgment of the court of the sister State binds the person as to whom it is invoked. Such judgments do not stand upon the same footing as domestic judgments. They may be attacked collaterally. *Huntington* v. *Attrill*, 146 U. S. 657, 685. There is nothing in the Federal Constitution or laws to prevent the most searching investigation, "into the jurisdiction of the court in which the judgment is rendered, over the subject matter, or the parties affected by it, or into the facts necessary to give such jurisdiction." Fuller, C. J., in *Thormann* v. *Frame*, 176 U. S. 350.

The present contention is that the judgment in favor of the executors of Lewisohn avails the defendant because they were privies respecting the subject matter of the suit. We do not find it to be the law of New York that in a suit in New York the defendant would be entitled to prevail on any other ground. The underlying question is one of jurisdiction. The defendant was not a party to the suit against Lewisohn. He was not served with process. No attempt was made by himself or by the plaintiff to join him as a party. Indeed, the bill in the Lewisohn suit alleges that Bigelow cannot be made a party by reason of

residence outside the jurisdiction, and this fact is not contro-
verted.   It follows that the United States Circuit Court for the
District of New York acquired no jurisdiction to render a judg-
ment binding upon or in favor of Bigelow, unless he was a privy
with Lewisohn.

It has been several times said that a judgment concludes,
and may be invoked by, one who is a privy. *Minneapolis
Association* v. *Canfield*, 121 U. S. 295, 308.   *Mitchell* v. *First
National Bank of Chicago*, 180 U. S. 471, 480, and cases cited.
These are general statements, however, and we do not find
that the precise point has ever been decided as to the effect
which must be given to the judgment in the courts of one
State touching privies, non-resident in the first State, and domi-
ciled in the one where the question arises.   Strong arguments
can be conceived to support the proposition that except as to
property rights arising by succession only those can be bound as
privies, who are domiciled within the State where the judgment
is rendered.   But we do not pursue this inquiry.   For the pur-
poses of this discussion we assume without deciding that such a
judgment binds privies of this description.   Whether or not he
was a privy is fundamental to the jurisdiction of the United
States Circuit Court to enter a judgment, which as to Bigelow
was capable of becoming *res judicata*.

At the outset it is to be observed that the domicil of the
defendant is in this Commonwealth, and that domicil gener-
ally determines the particular territorial jurisprudence to which
every individual is subjected.   *Grover & Baker Sewing Machine
Co.* v. *Radcliffe*, 137 U. S. 287, 298.

The foundation of the doctrine of *res judicata* is that there
has been a judicial inquiry into the subject matter, in which the
person to be affected by the judgment has had an opportunity by
representative to be heard fully.   The inquiry as to jurisdiction
is in its last analysis, whether one was in such relation to the
action in the sister State as to be bound by its judgment.   Ordi-
narily, the question of jurisdiction is whether one was in law a
party to the judgment.   Whether a court has jurisdiction of a
person depends upon whether he was really a party to it.   The
cases we have reviewed show that this is to be determined by
the courts of the government where it arises according to its ju-

risprudence, subject to the duty imposed by the Constitution of the United States. The law of the State whose courts entered the judgment does not control. Where it is not contended that one was a party, it is equally an inquiry as to jurisdiction to determine whether he was a privy to one who was a party. By parity of reasoning, whether one is a privy to a judgment rendered in a sister or foreign State must also be determined by the law of the sovereignty where the question arises.

Privity was not a matter in issue in the suit, judgment in which is pleaded, nor can it be determined by an inspection of the judgment roll. It must be decided by evidence outside the record. It is not to be settled according to the law of the State where the judgment is rendered. This plainly appears from *D'Arcy* v. *Ketchum*, 11 How. 165. The substance of the New York statute, there decided not to be entitled to full faith and credit when followed by the courts in entering judgment, was that, in cases of joint debtors, all non-residents should be privies with any domestic fellow or joint debtor duly served with process and bound by the judgment. See to substantially the same effect *Harris* v. *Hardeman*, 14 How. 334; *Ewer* v. *Coffin*, 1 Cush. 23; *Stone* v. *Wainwright*, 147 Mass. 201; *Phelps* v. *Brewer*, 9 Cush. 390. The same principle is illustrated in *Hall* v. *Lanning*, 91 U. S. 160, and *Public Works* v. *Columbia College*, 17 Wall. 521, where, by statute or usage, all partners were treated as so much in privity that appearance and defense by one bound all his copartners. Yet such a statute or usage was held not entitled to full faith and credit in the sister State.

We understand these federal cases in principle to cover the question before us, and to decide in substance that legislation or judicial determination of one State, that its domestic judgments shall bind non-residents decided by it to be privies, have no extraterritorial force, and are not entitled to recognition under the full faith and credit clause of the Federal Constitution. The same conclusion follows from the cases above cited, which permit inquiry into the extent of the powers of an agent to subject his principal to the jurisdiction of a foreign court.

But whether or not we interpret these decisions aright, as being decisive against this contention of the defendant, it seems to us that on reason it must be the law that the ascertainment of

those non-residents not served with process nor appearing, who are bound by the judgment of a sister State as privies, must be by the courts of the jurisdiction where the question arises, and not by those of the State in which the judgment is rendered. This rests primarily upon the considerations touching the constitutional provision and the reason for its enactment. Its purpose was not to enlarge or change the jurisdiction of the courts of the several States. It was a recognized principle of international law, at the time the Constitution was adopted, that where parties had once fairly litigated a dispute in the courts of any civilized government, the same question ought not to be tried anew. But such judgments were commonly regarded as *prima facie* evidence of the matter decided and might be re-examined under some circumstances, the whole subject resting in comity and not in obligation. *Bissell* v. *Briggs,* 9 Mass. 462. *Hilton* v. *Guyot,* 159 U. S. 113, 181. In this regard the several colonies before the Declaration of Independence were as to each other foreign nations. Differences of practice grew up, as to the way in which judgments of foreign courts should be proved, and the precise weight to be attached to them. It was in this state of the law that the Constitution was adopted. Diversity of practice was turned into uniformity by the Constitution, which prescribed the effect to be given to judgments of courts, and empowered Congress to legislate further as to forms of proof. But it was not intended to enlarge the jurisdiction of the courts of the several States, or confer any new power upon them. It has simply made certain and of universal application between the several States that which before rested only in comity, and does still as to judgments of courts of foreign nations. It was intended merely to be regulative. It " establishes a rule of evidence rather than of jurisdiction." *Anglo-American Provision Co.* v. *Davis Provision Co. (No. 1)* 191 U. S. 373. *Cole* v. *Cunningham,* 133 U. S. 107, 112. *Bissell* v. *Briggs,* 9 Mass. 462, 467. " Judgments recovered in one State of the Union, when proved in the courts of another government, whether State or national, within the United States, differ from judgments recovered in a foreign country in no other respect than in not being re-examinable on their merits, nor impeachable for fraud in obtaining them, if rendered by a court having jurisdiction of

the cause and of the parties." *Wisconsin* v. *Pelican Ins. Co.* 127 U. S. 265, 292. *Hanley* v. *Donoghue*, 116 U. S. 1, 4. *Hilton* v. *Guyot*, 159 U. S. 113, 185. *Union & Planters' Bank* v. *Memphis*, 49 C. C. A. 455, 465, and cases cited. This is further illustrated by what was said by Mr. Justice Gray, in *Lynde* v. *Lynde*, 181 U. S. 183, at pp. 186, 187 : "By the Constitution and the act of Congress, requiring the faith and credit to be given to a judgment of the court of another State that it has in the State where it was rendered, it was long ago declared by this court : ' The judgment is made a debt of record, not examinable upon its merits ; but it does not carry with it, into another State, the efficacy of a judgment upon property or persons, to be enforced by execution. To give it the force of a judgment in another State, it must be made a judgment there ; and can only be executed in the latter as its laws may permit.' "

In other words, the question whether the plaintiff can try its case here against Bigelow after failing against the estate of Lewisohn arises after full faith and credit have been given to the New York decree, and is not included in giving it full faith and credit. The decree does not have the effect contended for by the defendant *proprio vigore*. Whether it should bar the plaintiff from another suit is a question of public policy. Such a question must be decided according to the law of the State where it arises.

This conclusion is strongly supported by the argument of convenience. It is a principle of the common law that a judgment binds the parties and their privies. But there is no generally prevailing definition of privity which can be automatically applied to all cases. Who are privies requires careful examination into the circumstances of each case as it arises. Its determination is often difficult for a court possessed of plenary jurisdiction. But if the question who are privies is to be decided as a fact under the law of a foreign jurisdiction upon such evidence as the parties may be able to produce, complication is multiplied. The present case furnishes a capital illustration of the evil workings of such a rule. The courts of authority in New York seem not to have decided the precise question we now have to pass upon. Eminent lawyers have been called by both parties to testify as experts. But no two of them agree in their definition of privies, although several think that the ex-

ecutors of Lewisohn and the defendant were privies. There is great diversity in the details of the views expressed by those called by the defendant as to the exact grounds upon which they say the plaintiff would be barred in the courts of New York in a suit against Bigelow. We cannot conceive that it was the intent of the framers of the Constitution to put parties to the expense, inconvenience and unsatisfactory method of resorting to this class of testimony in order to establish their rights, when courts exist in every State, which could with much less difficulty determine the question according to the law of the forum. There is nothing inconsistent with this result in *Whitman* v. *Oxford National Bank*, 176 U. S. 559, and *Hancock National Bank* v. *Farnum*, 176 U. S. 640. These cases decided that the liability imposed upon stockholders in Kansas corporations, by the Constitution and laws of that State, were contractual in their nature, and were enforceable in the courts of other jurisdictions. These decisions in effect hold that the laws of a sovereign power, as to the rights and liabilities arising out of the relations between a domestic corporation and its stockholders, are binding upon the latter as contracts, because they assented to be so bound by voluntarily becoming such stockholders. *Bernheimer* v. *Converse*, 206 U. S. 516, 529. *Tilt* v. *Kelsey*, 207 U. S. 43, 47, simply decided in substance that a judgment *in rem* by a court having jurisdiction thereof binds everybody interested in it. *Laing* v. *Rigney*, 160 U. S. 531, held that on the facts shown the State court had jurisdiction of all persons sought to be charged. None of these decisions are apposite to the point now under discussion.

We are, therefore, of opinion that whether Bigelow was in such privity with the executors of Lewisohn, respecting the litigation in New York, as to be able to invoke, in his own defense, the judgment there rendered, is a jurisdictional question to be determined by the law of this Commonwealth, subject to the Federal Constitution.

It remains to inquire whether, according to the law of this Commonwealth, the Circuit Court for the District of New York had such jurisdiction of the defendant as to enable him to invoke its judgment as a bar in the present suit, on the ground of *res judicata.* This in turn depends upon the question whether

the defendant was a privy with the defendants in the Lewisohn suit, or in such relation to it that he can plead the judgment in favor of the Lewisohn estate, as an estoppel against the plaintiff. The evidence shows that he knew of the suit, and through his counsel gave such assistance in the preparation of the briefs for the arguments of that suit as might have been expected. But, as he was not a party, this fact is not of much importance. It is treated by most of the expert witnesses called by the defendant as to the New York law as of no consequence. Privity depends upon the relation of the parties to the subject matter, rather than their activity in a suit relating to it after the event. Participation in the defense because of general or personal interest in the result of the litigation does not make one privy to the judgment. *Stryker* v. *Goodnow*, 123 U. S. 527, 540. *People* v. *Knickerbocker Ins. Co.* 106 N. Y. 619.

The liability of the defendant, as has been pointed out, according to the law of this Commonwealth, is one arising *ex delicto*. The wrong committed was a tort, in which the defendant and Lewisohn acted in concert. The finding of the single justice, supported by the evidence is, in substance, that they were joint tortfeasors. The inquiry then is, whether one of several joint tortfeasors can plead a judgment in favor of his joint tortfeasor against a plaintiff claiming to have been injured by their joint act as an estoppel in a suit by the same plaintiff against himself.

This can hardly be regarded as an open question in this Commonwealth. In *Sprague* v. *Oakes*, 19 Pick. 455, which was an action for trespass *quare clausum fregit*, it was said, respecting such a defense, "The defendant was neither a party nor privy to that judgment, was not bound by it, nor could he take advantage of it." This case has never been overruled or questioned, and must be regarded as stating the law of this Commonwealth. There are other authorities to the same point. *Lansing* v. *Montgomery*, 2 Johns. 382. *Marsh* v. *Berry*, 7 Cowen, 344. *Moore* v. *Tracy*, 7 Wend. 229. *Gittleman* v. *Feltman*, 122 App. Div. (N. Y.) 385. *Atlantic Dock Co.* v. *Mayor & Aldermen of New York*, 53 N. Y. 64. *Tyng* v. *Clarke*, 9 Hun, 269. *Calkins* v. *Allerton*, 3 Barb. 171, 174. *Goble* v. *Dillon*, 86 Ind. 327. *Thompson* v. *Chicago, St. Paul & Kansas*

*City Railroad*, 71 Minn. 89.   *Three States Lumber Co.* v. *Blanks*, 118 Tenn. 627.

The reason upon which these decisions rest is that there can be no estoppel arising out of a judgment, unless the same parties have had their day in court touching the matter litigated, and unless the judgment is equally available to both parties.   It requires no discussion to demonstrate that a judgment in the Lewisohn suit against the defendants would not have fixed liability upon the present defendant.   Hence there can be no estoppel under our law or under the general principles of jurisprudence, because it is not mutual.   *Brigham* v. *Fayerweather*, 140 Mass. 411, 415.   *Dallinger* v. *Richardson*, 176 Mass. 77, 83. *Worcester* v. *Green*, 2 Pick. 425, 429.   *Biddle & Smart Co.* v. *Burnham*, 91 Maine, 578.   *Moore* v. *Albany*, 98 N. Y. 396.   " Estoppels to be good must be mutual."   *Litchfield* v. *Goodnow*, 123 U. S. 549, 552.   *Nelson* v. *Brown*, 144 N. Y. 384, 390.   Bigelow could not have appeared as of right and made a defense in that suit.   No judgment can be regarded as *res judicata* as to any matter where the rights in the subject matter arise out of mutuality, and not by succession, unless the party could, as matter of right, appear and defend, even though he may have had knowledge of the suit. Otherwise, he might be bound by a judgment as to which he had never had the opportunity to be heard, which is opposed to the first principles of justice.   *Brabrook* v. *Boston Five Cents Savings Bank*, 104 Mass. 228, 233.   There is no privity between joint wrongdoers, because all are jointly and severally liable.   *Corey* v. *Havener*, 182 Mass. 250.   *Feneff* v. *Boston & Maine Railroad*, 196 Mass. 575, 581.   *Pinkerton* v. *Randolph*, 200 Mass. 24, 28.   There is no right of contribution between joint wrongdoers, where they are *in pari delicto* with each other.   *Churchill* v. *Holt*, 127 Mass. 165.   They are equally culpable, and the wrong complained of results from their joint effort.   The right of recovery over by a municipality against a person, whose wrong created a defect in the highway (*Holyoke* v. *Hadley Co.* 174 Mass. 424) is no exception to this rule, because the tort committed by each of the wrongdoers is diverse in character, and rests upon a different basis of liability, and there is a right of indemnity in favor of the municipality.   *Lowell* v. *Glidden*, 159 Mass. 317, 319.   We are aware of no instance of joint participation in a common tortious en-

terprise where there is any right of contribution. One comprehensive definition of privies is such persons as are " privies in estate — as donor and donee, lessor and lessee and joint tenants; or privies in blood — as heir and ancestor; or privies in representation — as executor and testator or administrator and intestate; or privies in law — where the law without privity in blood or estate casts land upon another, as by escheat." *Buckingham* v. *Ludlum*, 10 Stew. 137, 141. *Douglass* v. *Howland*, 24 Wend. 35, 53. Joint tortfeasors come within none of the classes thus described. The definition in 1 Greenl. Ev. § 535, adopted by the Supreme Court of the United States, in *Litchfield* v. *Goodnow*, 123 U. S. 549, 551, namely, " Mutual or successive relationship to the same rights of property " equally fails to include joint tortfeasors. If we turn to the law of privity as illustrated in actions against partnership and joint debtors, "the soundness of this conclusion is confirmed. It has been repeatedly decided that an administrator of a decedent in one jurisdiction is not in privity with an administrator of the same estate appointed in another jurisdiction, and that a judgment against one such administrator is not *res judicata* to the other. *Ingersoll* v. *Coram*, 211 U. S. 335, and cases cited. *Johnson* v. *Powers*, 139 U. S. 156. In *Chase* v. *Henry*, 166 Mass. 577, it was held that discharge in insolvency in this Commonwealth did not bar the debt of a copartnership, one member of which was a non-resident, although two were residents and the copartnership had a regular place of business here. It has been several times held that judgment against one surviving partner upon a claim against the partnership was not admissible in evidence against the executors of a deceased partner, although the existence of the partnership was not disputed. *Buckingham* v. *Ludlum*, 10 Stew. 137. *Moores' Appeals*, 34 Penn. St. 411. *Sturges* v. *Beach*, 1 Conn. 507. *Larison* v. *Hager*, 44 Fed. Rep. 49. The converse, which is exactly parallel to the present case, namely, that a judgment in favor of one partner or joint and several debtor will not avail his associate in liability, has often been decided. *Townsend* v. *Riddle*, 2 N. H. 448. *McLelland* v. *Ridgeway*, 12 Ala. 482. *State Bank* v. *Robinson*, 13 Ark. 214, 221. *Detroit* v. *Houghton*, 42 Mich. 459, 460. It is difficult to conceive of persons more closely identified with their common

business than joint debtors and partners, and if judgments against one do not bind his associate, we do not see how persons occupying the less intimate relation to each other, which Bigelow and Lewisohn did, can be bound as privies.    See also *Williams* v. *Bankhead,* 19 Wall. 563, 570.

Apart from authority and on principle the same result seems necessary.    Joint tortfeasors act in unison respecting a common wrongful enterprise.    It is one of the penalties, which the common law (differing in this respect from the civil law) inflicts upon those who jointly engage in intentional violation of the rights of others, that each shall be left to bear the natural results of his conduct.    Courts will not lend their aid in adjusting the conflicting claims of wrongdoers touching their own turpitude.

An injured party is given the right to pursue his remedy, either singly or together, against those who thus cause injury, and may proceed to judgment against all in separate actions. He is barred only by a satisfaction.    An inevitable corollary of these generally undisputed propositions and one consonant with a fundamental sense of justice is that a party has a right to try his case against everybody who has done him a wrong by immediate and direct culpable action.    He is not precluded by a failure against one alleged joint wrongdoer from attempting to pursue another.    He is entitled to his day in court against a particular adversary.    We believe there are no exceptions to this rule stated in this form.    The cases where judgment in favor of an active agent or servant avails a passive principal or master (*Portland Gold Mining Co.* v. *Stratton's Independence,* 158 Fed. Rep. 63 and cases cited), or where the relation of indemnitor and indemnitee exists (*Port Jervis* v. *First National Bank of Port Jervis,* 96 N. Y. 550) do not constitute exceptions to this rule, but stand on a different ground.

For another reason the New York judgment in favor of Lewisohn seems not to be a bar.    The joint actor with the defendant was not the defendant in the New York suit, but it was prosecuted against his executors.    If it be assumed that there was a kind of privity between the two who acted in concert, that privity was broken by the death of one.    There is no privity between Lewisohn's executors and Bigelow.    *Ela* v. *Edwards,* 13 Allen,

48.   *Merrill* v. *New England Ins. Co.* 103 Mass. 245, 249. *Thomson* v. *American Surety Co.* 170 N. Y. 109.   It cannot be said that the plaintiff has elected to pursue his remedy against the estate of Lewisohn to the exclusion of his rights against Bigelow.   As between joint tortfeasors the doctrine of election has no application, and moreover the plaintiff sought the New York forum voluntarily only in the sense of being compelled to go there that a court might acquire jurisdiction of those defendants.

The determination that the relation between Lewisohn and Bigelow was that of joint tortfeasors respecting a cause of action arising *ex delicto* disposes also of the argument pressed by the defendant, that Lewisohn was trustee, agent or representative of Bigelow to such an extent that he was in privity with him. See. *Bigelow* v. *Old Dominion Copper Mining & Smelting Co.* 4 Buch. (N. J.), 71 Atl. Rep. 153, 176.

The conclusion is, therefore, that the matters set up in the supplemental answers do not preclude the plaintiff from continuing the prosecution of the present suits.

Both parties have introduced a large amount of evidence as to the law of New York touching the effect which would by its courts be accorded to the judgment against the plaintiff in the Lewisohn litigation in a suit like the present pending in its courts against the defendant.   In the view which we take of this case that question has become wholly immaterial, and we do not pass upon it.

13.   The defendant has briefly argued that a decision for the plaintiff in these suits involves a denial to him of due process of law, the equal protection of the laws, and an impairment of the obligation of contracts.   It does not seem necessary to discuss these arguments further than to say that they do not appear to us to have any application to the issues here pending.

14.   The present cases were upon the calendar of the full court for argument at its January sitting, 1908.   Upon motion of the defendant based upon representations as to the need of delay to enable him to prepare a brief, they were assigned as the first cases for argument at the March sitting of this court, 1908. A few days before the coming in of the court at that sitting, the present defendant applied to the Court of Chancery in the State

of New Jersey, where the plaintiff is domiciled, and secured a temporary injunction against its prosecution of these suits. The suit in New Jersey was decided adversely to the plaintiff by the chancellor, in whose elaborate opinion one of the vice-chancellors concurred, on August 8, 1908. *Bigelow* v. *Old Dominion Copper Mining & Smelting Co.* 4 Buch. (N. J.), 71 Atl. Rep. 153. This decision was not by the court of last resort, and the present defendant, the plaintiff there, asserted that he intended to prosecute an appeal to the highest court in the State of New Jersey. Thereupon, on motion, an interlocutory decree was entered by a single justice of this court, restraining the defendant, " his attorneys, agents and servants from further prosecuting the action commenced by said Bigelow against the plaintiff in the Court of Chancery in the State of New Jersey . . . '; and from commencing or prosecuting any other suit or proceeding either in law or in equity, except in this court, against the plaintiff to prevent it from obtaining the final decision and decree of this court or in any manner to delay or impede the presentation of said case." These suits were then pending before the full court under R. L. c. 159, § 19. This statute, however, does not prevent the entering by a single justice of decrees respecting interlocutory matters which may call for a speedy hearing and decision, but in no wise affecting the questions covered by the final decree. R. L. c. 159, §§ 17, 21, 22. *Parker* v. *Nickerson,* 137 Mass. 487, 491. The defendant appealed from this interlocutory decree and from a refusal of the single justice to modify or vacate it.

It is a general principle of chancery jurisprudence that, as between courts of co-ordinate and concurrent jurisdiction, the court which first obtains possession of a transaction shall dispose of it without interference from other courts. *Riggs* v. *Johnson Co.* 6 Wall. 166, 196. *Home Ins. Co.* v. *Howell,* 9 C. E. Green, 238. The jurisdiction of courts of equity to restrain a citizen suitor from prosecuting litigation in another State is well settled. *Cunningham* v. *Butler,* 142 Mass. 47 ; *S. C. sub nomine Cole* v. *Cunningham,* 133 U. S. 107. The present suits were begun October 7, 1902. This court plainly had jurisdiction of the subject matter and the parties. The defendant made no contest in these respects, but proceeded to hearing upon the merits and accepted the jurisdiction of the court up to the point of argument

before the full bench. It was manifestly proper that at this stage of the proceedings, in view of his conduct of the suits, theretofore, he should be restrained from attempting to interfere in courts of other jurisdiction with the conclusion of this litigation. It is hardly necessary to say that the interlocutory decree does not purport to restrain him from enforcing whatever rights he may have to a writ of error from the Supreme Court of the United States to the final judgments which may be entered in this court. His full rights under the Federal Constitution are preserved. The decrees are to be so modified as to include the costs of these appeals, and as modified are affirmed.                    *So ordered.**

KNOWLTON, C. J.   This is an important case. The decrees from which the appeal was taken to this court call for the payment of considerably more than two million dollars. The questions of law involved are far-reaching. As I do not agree to the opinion of the majority of the court, I deem it my duty to state the reasons for my dissent.

The fundamental question is, what right and power has a corporation to bind itself, acting through its stockholders in confirmation of the doings of its directors, in the transaction of business, after it has been completely organized under the law of the State of New Jersey, and after the amount of the capital required to authorize it to do business under the statute has been paid in, but before the whole of its capital stock has been issued or subscribed for. The plaintiff corporation was established under the laws of the State of New Jersey. Its rights and powers, and the rights of its stockholders, depend upon the law of that State. Unless it has suffered a wrong as a corporation of that State it has no standing here.

To organize a corporation under the laws of New Jersey, articles of association in writing must be signed by not less than three persons, stating the name of the company, the place or places where its business is to be conducted, the object for which it is to be formed, " the total amount of the capital stock of such company, which shall not be less than two thousand dollars, the amount with which they will commence business, which shall not be less than one thousand dollars, and the num-

* The case was taken to the Supreme Court of the United States by writ of error. *Mason* v. *Carrothers*, 105 Maine, 392, decided on May 28, 1909, was not in print until after the above decision was rendered.

ber of shares into which the same is divided, and the par value of each share." It must also contain a statement of the names and residences of the stockholders and the number of shares held by each, with the "period at which such company shall commence and terminate, not exceeding fifty years." Gen. Sts. of New Jersey, 912–946, §§ 10–189. The certificate must be proved and acknowledged, and then recorded as deeds of real estate are required to be recorded. It must also be filed in the office of the secretary of state. When this has been done, the company is a corporation from the time of the commencement of the period fixed in the certificate.

The report of the single justice, with the evidence, shows that the plaintiff corporation was organized in all respects in compliance with the statute, that the requisite amount of capital to qualify it to commence business was paid in in cash, and that the corporation was legally authorized to do any business within the purposes of its organization. Although but a small part of its authorized capital had been paid in or subscribed for, it was permitted by law to exercise all the powers of a corporation and to perform all its contemplated functions for fifty years, if it could obtain money or credit sufficient for the purpose. It then made contracts with the defendant Bigelow and his associate Lewisohn, who were the promoters of it, and who therefore stood in fiduciary relations to it, which contracts would be voidable as fraudulent for that reason, unless there was a full and fair disclosure of the facts to the corporation, as represented either by an independent board of directors who were in a position properly to protect its rights, or by its existing stockholders who were the owners of it. The directors were selected by the defendant and Lewisohn, and they were not impartial and independent officers, qualified properly to represent the corporation in matters where its interests might be adverse to those of the promoters. Indeed, as stockholders, they were then the representatives of the promoters. The capital which they paid in under their subscriptions was paid with money furnished by the promoters, and the beneficial interest in all the stock of the company, as it was then organized, was in the defendant and Lewisohn, who were the real owners of the entire corporation. Under these contracts, and in payment for property conveyed to

the corporation, thirty thousand shares of stock were issued to
the defendant and Lewisohn and taken in their names, and one
hundred thousand shares were issued to Philip E. Dumaresq,
" who took them as the nominee and for the benefit and subject
to the orders of the defendant and Lewisohn."    These shares
" were held for and controlled by the defendant and Lewisohn."
Twenty thousand shares more, which made up the total au-
thorized capital of the company, were found by the judge to
have been still the property of the corporation itself, and they
were intended to be issued to independent subscribers for a
working capital.    They then stood in the name of Thomas Nel-
son, treasurer.    More than two months after the original con-
tracts were made, and while the ownership of the stock was as
above stated, all the directors of the corporation signed, in the
record book, a statement approving of the previous action of the
board in making these contracts, and a similar statement was
signed by the defendant and Lewisohn and Dumaresq as stock-
holders, and by Nelson as a stock-holding treasurer.

Upon these findings the defendant and Lewisohn were the
owners of all the authorized capital stock of the corporation,
except the twenty thousand shares in the treasury, which be-
longed to the corporation, and through the corporation they
owned that also.    As stockholders, they knew all the facts
affecting the validity or propriety of the contracts which they
had made with the company.    At that time they had no interest
adverse to that of the corporation, for they were the sole owners
of the corporation.    One question is whether this ratification
with full knowledge, by all the stockholders, was binding upon
the corporation.    Another question is whether the contracts
were valid when originally made, having been agreed to with
full knowledge by the only persons beneficially interested in the
corporation.    More specifically, the broad question is whether a
corporation, which has full power to make every other kind of
a contract within the purposes of its organization, is powerless
to make a contract, or through its stockholders to ratify a con-
tract, with one standing in a fiduciary relation to it.

There is no question of fraud upon the corporation; for all
of the owners of it were fully informed in regard to the transac-
tions, and approved of them.    Under such circumstances there

can be no fraud. After a corporation is fully organized, the stockholders for the time being own and control it. In a broad sense, they are the corporation, although the corporation as a separate entity may exercise its powers as an individual, under their direction and for their benefit. The power of a corporation through its stockholders, choosing proper agents, to deal formally with those in a fiduciary relation to it is established beyond the possibility of question. It matters not that the fiduciaries are themselves stockholders, if the other stockholders are not misled. And it matters not whether they constitute all of the stockholders, or only a part of them, if all the stockholders know all the facts and consent to the transaction.

The only question that seems to me debatable, on this branch of the case, is whether the power of the corporation, or of its stockholders, to act in matters of this kind is taken away by the fact that its stock is not all issued, and that a part of it is retained to be issued to obtain working capital, or for other purposes. On principle, it is difficult to see how this can affect its right under the law to do business of this kind, as it may do business of every other kind.

It is suggested that to make contracts with one in a fiduciary relation may be detrimental to the interests of the corporation, and constitute a fraud upon persons subsequently subscribing for stock not then issued, even if the existing stockholders know all the facts and are content. But it is to be noticed that, under the law of New Jersey, the organization of a corporation does not necessarily give any indication or suggestion as to the value of its stock. It does not indicate that more than $1,000 of capital has been actually paid in, if that sum is fixed in the articles of association as the amount necessary to qualify it to do business. As to the balance of the shares, it does not show whether much, or little, or nothing at all has been paid upon them. It does not indicate that contracts have or have not been made with the corporation, and if they have been made, whether they are advantageous or disadvantageous to it. Under this system, everybody is bound to know that, apart from the general facts of organization which appear of record, one buying stock or subscribing for it must ascertain by inquiry if he would know whether it is of large value or of no value. Evidently the

statute was intended to give very broad latitude to organizers of corporations, and to give corporations full powers to contract, while only a small amount of stock has been issued, which may be owned by a very few persons.

Promoters, as well as directors, stand in a fiduciary relation to a corporation. They do not stand in such a relation directly to particular stockholders, or to a particular class of stockholders. Their relation to stockholders is only as the stockholders claim through the corporation by virtue of their ownership of it. Through the corporation, promoters and directors stand in this relation to those who own stock while their fiduciary relation to the corporation continues. They are never in such a relation to those who become stockholders after their relation to the corporation has ended. Their fiduciary relation to the corporation extends through it to all the owners of it. The stockholders for the time being are all the owners of it. These stockholders can sell its property, or wind it up, or control it as they please. No one else has any interest in it, and the directors or promoters have no relations, as such, to any one else. If additional stock is issued after their relations to the corporation are terminated, they are not and they never were in fiduciary relations to the takers of this new stock. In this respect there is no difference between directors and promoters. All this is said in reference to corporations which are regularly and completely organized, and are authorized to do business and fully to exercise their powers and franchises under the law, notwithstanding that a part of their authorized capital has not been taken. Of course, if a corporation is merely in an inchoate condition, and has not acquired the power to exercise its franchises, a different rule would apply.

So too, promoters may enter into arrangements with underwriters or syndicates or single persons who expect to take stock, and may thus assume obligations. In the present cases I do not intimate that the defendant might not be held liable to some of the persons who arranged with him to take a part in the enterprise.

But whatever may be thought of the conduct of promoters who make contracts with a corporation while they are the sole owners of it, and whether it be held that their fiduciary rela-

tions extend to future stockholders or only to those who are the owners while this relation exists, the question before us is whether, under the law of New Jersey, a corporation is power-less to bind itself as to such contracts, when they are entered into with the assent of the existing stockholders, all of whom have full knowledge of the facts.   On principle, I think that a corporation organized in that State is not so crippled.   Let us consider the authorities.

*In re Ambrose Lake Tin & Copper Mining Co.* 14 Ch. D. 390, was a case in which a sale of property was made to a corporation by the promoters of it, which would have been voidable for fraud if the promoters had not been the owners of its stock.   It was held that, inasmuch as the vendors were themselves the stock-holders of the company and knew all the facts, there was no fraud upon the corporation   In this case the judges thought that one of the purposes of these promoters was to obtain profit from future purchasers of the stock who were ignorant of the transaction ; but under the circumstances the corporation could not avoid the contract.   In *North-West Transportation Co.* v. *Beatty*, 12 App. Cas. 589, a contract of purchase of property by a corporation was entered into by directors with one of their number.   It was held that the vendor was entitled to exercise his voting power as a stockholder to ratify the contract.   He controlled a majority of the votes through ownership of his stock, acquired in a manner authorized by the constitution of the company.   It was held that his exercise of his power could not be deemed oppressive for this reason.   Sir Richard Baggallay, in delivering the unanimous opinion of the Privy Council, said, " Unless some provision to the contrary is to be found in the charter or other instrument by which the company is incor-porated, the resolution of a majority of the shareholders, duly convened, upon any question with which the company is legally competent to deal, is binding upon the minority, and consequently upon the company, and every shareholder has a perfect right to vote upon any such question, although he may have a per-sonal interest in the subject matter opposed to, or different from, the general or particular interests of the company."   Referring to dealings with a director acting in a fiduciary capacity, he said : " Any such dealing or engagement may, however, be

affirmed or adopted by the company, provided such affirmance or adoption is not brought about by unfair or improper means, and is not illegal or fraudulent or oppressive towards those shareholders who oppose it." In this case, ratification was by only a small majority of the stockholders.

*Salomon* v. *Salomon*, [1897] A. C. 22, was a case in which the proprietor of a business organized a corporation with a capital stock of forty thousand shares, of the par value of one pound each. He, his wife, his daughter and his four sons took one share each. With only seven shares taken, he sold out his business to the corporation for a price which might be found to be much more than it was worth. He then took twenty thousand shares more of the stock; the remaining nineteen thousand nine hundred and ninety-three shares never were issued. The company soon became insolvent, and a receiver, in the interest of creditors, sought to hold this organizer and promoter for fraud upon the corporation. It was held upon these facts that there was no fraud and no liability. Lord Chancellor Halsbury quoted from the headnote in *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218, and then said, " But if every member of the company — every shareholder — knows exactly what is the true state of the facts (which for this purpose must be assumed to be the case here) Vaughan Williams, J.'s conclusion seems to me to be inevitable, for no case of fraud upon the company could here be established." He said this in a case in which only seven shares of stock out of an authorized capital of forty thousand shares had been issued when the contract with the promoter was made. This case seems to me fully to cover the case at bar, in which the only fraud proved was the constructive fraud of a sale to a corporation from one in a fiduciary relation to it.

Other cases establish the proposition that it makes no difference that not all the stock of the company has been issued, if the holders of all outstanding stock agree. In *St. Louis, Fort Scott & Wichita Railroad* v. *Tiernan*, 37 Kans. 606, and *Stewart* v. *St. Louis, Fort Scott & Wichita Railroad*, 41 Fed. Rep. 736, a part of the stock, although not a large amount, was issued to municipalities after the transaction to which the stockholders agreed. In *Hutchinson* v. *Simpson*, 92 App. Div. (N. Y.) 382, a large amount of stock was held in the treasury for other

corporate uses. The same was true in *Blum* v. *Whitney*, 185 N. Y. 232, which in its reasoning and the authorities cited is a very strong case for the defendant. Only a part of the authorized stock had been issued when the contract was made in *In re British Seamless Box Co.* 17 Ch. D. 467, and more was issued about a year and a quarter afterwards. *Tompkins* v. *Sperry*, 96 Md. 560, is an important case supporting the proposition that stockholders may bind the corporation in transactions of this kind which are voidable for constructive fraud. Except as I shall state hereafter, I know of no case which holds that it makes any difference that not all the stock has been issued, if the corporation is completely organized and authorized to go on with its ordinary business. There are dicta of some English judges, indicating that such a transaction, when it is expected that a prospectus will be issued under the English practice inviting subscriptions for stock from the public, would be fraudulent as against future stockholders. These are in opinions in which the judges hold that there is no fraud upon the corporation as there was knowledge and consent of the stockholders, and they seem to assume that the corporation is not fully organized and qualified to do business. But they are without discussion or seeming consideration of the question when a corporation and its stockholders become competent to make binding contracts as to such matters. Other cases which support the defendant's position are *Foster* v. *Seymour*, 23 Fed. Rep. 65, *McCracken* v. *Robison*, 57 Fed. Rep. 375, and *Barr* v. *New York, Lake Erie & Western Railroad*, 125 N. Y. 263.

This court, in *Hayward* v. *Leeson*, 176 Mass. 310, in dealing with a corporation established under the laws of Tennessee, held that the receivers of the company might maintain a suit for fraud against promoters, notwithstanding that the stockholders, at the time of the transaction, knew all the facts and agreed to the contract. The particulars of the statute of Tennessee, as to the organization of corporations, do not appear in the report of the case. When the present suits came before the court upon a demurrer, *Hayward* v. *Leeson* was followed and held to govern them. 188 Mass. 315. The precise questions which were then before us have been considered by the Circuit Court of the United States and the United States Circuit Court of Appeals

in the second circuit, in a suit brought by this plaintiff against Lewisohn's heirs, and upon a demurrer to averments of fact against Lewisohn substantially identical with those against the defendant in the present suits, there was a decision for the defendants. *Old Dominion Copper Mining & Smelting Co.* v. *Lewisohn*, 136 Fed. Rep. 915 ; *S. C.* 148 Fed. Rep. 1020. As appears by the record before us, five judges of the federal courts in that circuit, at different stages of the proceeding, agreed in their view of the law of the case. The suit was then carried to the Supreme Court of the United States, and the justices of that court were unanimous in sustaining the defendant's demurrer. Upon the averments of the bill, they treated Bigelow and Lewisohn as the real owners of the corporation when the contracts were made, through their appointees, who took the stock which they paid for. The judge who wrote the opinion sat as Chief Justice with those other members of this court who took part in the decision of *Hayward* v. *Leeson*. The view expressed in the opinion of the Supreme Court of the United States is at variance with a part of the reasoning and with the decision in *Hayward* v. *Leeson*. This latest decision must be treated as establishing the law for the federal courts. The cases cited show that the law is settled in the same way in some of the State courts.

In addition to the deference that a unanimous opinion of the justices of the Supreme Court of the United States should receive in any other court, it is for me a very important consideration that, upon questions which will often be litigated in the federal tribunals by reason of the diverse citizenship of the parties, the law ought to be the same in the State courts as in the federal courts. It would be unfortunate if, in this large class of cases, the rights of a suitor should depend upon whether he is finally held subject to the jurisdiction of a federal court or to that of a State court.

It seems to me that the great weight of authority, upon the turning point of this case, is in favor of the defendant. I do not regard the case of *Erlanger* v. *New Sombrero Phosphate Co.* 3 App. Cas. 1218 (5 Ch. D. 73), relied on by the plaintiff, as having any bearing upon the question on which the present case turns, namely, when is a corporation so far organized that its stock-

holders, acting with full knowledge, can bind it? No such question arose in that case, and there was no occasion to consider such a question. So far as appears, the question was never thought of. The court was dealing with a fraud upon a corporation whose stockholders were ignorant of the facts that constituted the fraud, and took no action in regard to the matter. It seems to me that the dicta of certain English judges relied on by the majority of the court overlook the fact that the fiduciary relation of promoters of a corporation is of no practical consequence if the promoters are the sole owners of the corporation, and if, at the time of the transaction in question, the corporation is legally organized and qualified to do every kind of business, although this fact is generally recognized by the English courts. I also think that the judges uttering the dicta were influenced by the statutory provision in the English law for the issuing of a prospectus to the public, inviting subscriptions to the stock, after the corporation is organized in other particulars. There is no such provision in the statute of New Jersey.

It is also to be remembered that the dicta were uttered in connection with decisions that the corporation was bound by the knowledge and action of all its existing stockholders, notwithstanding that only a part of the authorized stock had been taken. One or two of the dicta are in other cases in which no question in regard to action by all the stockholders with knowledge arose. In *Pietsch* v. *Milbrath*, 123 Wis. 647, 651, it appears that the plaintiffs took their stock upon grossly false representations as to the organization of the corporation, and they were allowed a remedy. *Yeiser* v. *United States Board & Paper Co.* 107 Fed. Rep. 340, 348, was a case of gross, active fraud, and some stockholders who were ignorant of the facts were brought in before the transaction in question was consummated. Of course, this decision is of no effect as against the later adjudication in 210 U. S. 206, covering the precise question before us. Neither of these two cases seems to me important in reference to the question on which the present decision depends. I think the corporation in the present case is bound by the knowledge and consent of its stockholders.

The defendant relies upon the independent defense that the decision against the plaintiff, upon the same averments of fact

in the suit against the other of the two joint actors, is a bar to the present claim, as *res judicata*.   Evidence was introduced to prove the law of New York, where the decree was entered.   The defendant called thirteen witnesses of the greatest eminence and distinction, who testified as experts in law that, in their opinion, under the law of New York, the decree would be a bar to these suits if they were brought against this defendant in the courts of that State.   Many of these witnesses had had a long judicial experience.   Three of them had sat in the Court of Appeals, two of them for long terms, and one as a Chief Judge.   Several others had served a long time in the Supreme Court of New York, sitting in the general term and in the appellate division. Others had held other high positions in their profession, and all of them were lawyers whose opinions are entitled to great weight. The plaintiff called two eminent lawyers who expressed a contrary opinion.   Many decisions of the courts of New York were also put in evidence.   The defendant contended that, if the decree is a bar under the law of New York, it is equally so when pleaded in Massachusetts.

If it were necessary to consider this branch of the defense, it perhaps would be a grave question whether the defense was or was not made out.   But as to that I express no opinion, preferring to rest this opinion on the other ground.

I am authorized to say that Mr. Justice Morton concurs in this opinion.

HAMMOND, J.   Upon the questions (1) whether the facts found by the single justice are supported by the evidence and should stand, (2) whether "the transaction is to be determined by the law of Massachusetts," (3) whether the plaintiff has been guilty of laches, (4) what shall be the nature of the relief (if there is any relief), (5) what effect shall be given to the judgment rendered in the Lewisohn case by the Circuit Court of the United States for the Southern District of New York, (6) whether a decision for the plaintiff in these suits involves a denial to the defendant of due process of law, or the equal protection of the laws, and (7) whether the interlocutory order entered by a single justice enjoining the defendant from further prosecuting his suit against the plaintiff elsewhere except

in this court should stand, I agree with the majority of the court.

But upon the question on the merits, namely, whether upon the facts found the defendant is answerable to the plaintiff, I agree with the dissenting opinion filed by the Chief Justice; and for the reasons stated therein I think that the bills should be dismissed.